FEDERAL DEPOSIT INSURANCE CORPORATION, Receiver of Metro Bank, etc., Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Civ. A. No. 79–3013–H.

United States District Court, S. D. West Virginia, Huntington Division.

Dec. 8, 1981.

Arch A. Moore, Jr., Charleston, W. Va., Troy B. Conner, Jr., Conner, Moore & Corber, Washington, D. C., for plaintiff.

Mary Stanley Feinberg, Asst. U. S. Atty., S. D. W. Va., Charleston, W. Va., William D. White and Gordon A. Jones, Attys., Civil

**944**

Div., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, District Judge.

There are presently four motions before the Court which have been fully supplemented by briefing and which are ready for decision. First, the Court will consider Defendants' motion for summary judgment. Second, the Court will address the Plaintiff's objections to an order of the United States Magistrate concerning discovery matters. Third, the Court will address the opposing motions of the parties concerning the propriety of class certification.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for partial summary judgment pursuant to *Rule* 56, subparts (a) and (b), Federal Rules of Civil Procedure, based on the eighth defense and fourth and eighth counterclaims contained in its response to Plaintiff's complaint. They contend that there is no liability to Plaintiff arising from insurance coverage on defaulted student loans where Plaintiff failed to pay the insurance premiums prior to loan default.

### A. *Plaintiff's Compliance with Rules and Regulations.*

■ While there is no factual dispute concerning whether insurance premiums as to the loans at issue were paid: Plaintiff admits they were not, there is controversy concerning the Defendants' mechanism for the billing of insurance premiums and whether Plaintiff was excused from compliance. It is Plaintiff's position that it was excused from compliance because, although at all times it was ready to pay the insurance premiums, no demand by Defendants for payment was ever made. In fact, Plaintiff contends that it was instructed, specifically, not to pay insurance premiums on student loans until a demand was made.[1]

Although Defendants have contested the materiality of any of its documents containing statements concerning how and when insurance premiums were to be paid, this Court in reviewing the applicable statutes and regulations has determined that merely because a premium is *payable* at the time the loan is disbursed does not require, the

1. In an attached affidavit of Rex Whaley, a former official at Metro Bank, the Plaintiff asserts:

> With respect to the payment of insurance premiums on its student loans, the initial instructions received and relied upon by Metro Bank came in a bulletin entitled "Federally Insured Student Loan Program," dated December 15, 1968 (copy attached as Appendix A). This bulletin stated, *inter alia*, as follows:
>> Premiums should be held by the lender until they are requested by the Office of Education.
>
> Accordingly, Metrobank did not pay student loan insurance premiums until payment was requested by HEW *per* its express instructions. My recollection in this respect is confirmed by two other bulletins which were issued by HEW to student lenders at approximately the same time. In a FISLP Program Operating Guide (copy attached as Appendix B), the lender banks were instructed:
>> Payment of the insurance premiums will be offset against interest billings.
>
> In another FISLP bulletin, dated, June 1967 (copy attached as Appendix C), HEW likewise instructed lenders:

>> Insurance premiums which are due will be offset against [interest] billings.
>
> Metro Bank never received any notice that it was delinquent in the payment of these FISLP insurance premiums, or that it was obliged to assume the initiative in calculating the amount due as FISLP insurance premiums or making payment thereof prior to a billing by HEW.
>
> Subsequent to the earlier instructions described in paragraph 3, above, Metro Bank was furnished with a FISLP Manual for Lenders prepared by the Division of Insured Loans, Bureau of Higher Education, U. S. Office of Education (May 31, 1972). While all but 4 of the 208 loans for which no insurance premium has been paid were approved by HEW prior to the issuance of the Manual for Lenders, my recollection of the procedure for the payment of insurance premiums is confirmed by reference to the aforementioned Manual for Lenders, which states in Chapter III (F)(3)(b):
>> NOTE: The lender should *never* submit the premium due on a loan before it appears on the FLTS [Federal Loan Transaction Statement].

holding as a matter of law, that there is no insurance coverage if the premium was not *paid* at that time.[2] Under this argument, Defendants would have this Court disregard the "Manual for Lenders" and other instructional bulletins which do not constitute regulations and, which are not part of the "contract of insurance." Defendants also contend, however, that Plaintiff never reported disbursement of the loans at issue so that billing could be done and, thus, Plaintiff may not rely on Defendants' failure to bill for payable premiums as an excuse for nonpayment of premiums.

The form by which the Plaintiff communicated student loan information to Defendants is called the "Lender's Manifest." Defendants contend that the available records reflect that Plaintiff submitted eighty-three Lender's Manifests to the Office of Education from the beginning of its participation in the Federally Insured Student Loan Program (FISLP) on June 30, 1971, through October 13, 1978. Defendants assert that twenty-seven of the loans at issue were not recorded on the Lender's Manifests, and that of the three hundred six loans at issue which were recorded on the Lender's Manifests, none were reported as disbursements. Defendants' position is that it is only by listing a student loan on the Lender's Manifest as a disbursement that billing for premiums is triggered.[3] After

---

**2.** Defendants rely on the following statutory and regulatory provisions in this regard:

20 U.S.C. § 1079(a)(2) and (c):

*Effective date of insurance*

(a)(2) ... Such insurance shall cease to be effective upon sixty days' default by the lender in the payment of any installment of the premium payable pursuant to subsection (c) of this action.

\* \* \* \* \* \*

*Premium charges*

(c) The Commissioner shall, pursuant to regulations, charge for insurance on each loan under this part a premium in an amount not to exceed one-fourth of 1 per centum per year of the unpaid principal amount of the loan (excluding interest added to principal), payable in advance, at such times and in such manner as may be prescribed by the Commissioner....

45 C.F.R. § 177.45(b):

(b) *Collection of premiums.* Premiums covering that period of time which runs from the disbursal of the loan to the time that it anticipated, in accordance with instructions issued by the Commissioner, that repayment of principal is to begin *shall be payable at the time the loan is disbursed....* (Emphasis supplied).

**3.** The affidavit of Ralph B. Madden, a Loan Program Specialist in the Transaction & Billing Branch of the Division of Operational Support of the Office of Guaranteed Students Loans— United States Office of Education (OE), states in pertinent part:

Within 30 days after disbursal of a loan, the lender was to report the disbursement on the Lender's Manifest (OE Form 1151). This form remained unchanged during the relevant time of this lawsuit, 1971–1979.

The information on the Lender's Manifest was then entered into OE's computerized data bank, which would update the Loan Control Master File. The original Manifests were retained at a private storage facility. On a monthly basis, OE billed lenders for insurance premiums on a Federal Loan Transaction Statement (FLTS) (OE Form 1199). The OE computer generated this billing based on the information that had been entered from previous months' Lender's Manifests.

The premium was calculated at a rate of ¼ of one percent of the amount of the loan per year until repayment began 12 months after the anticipated graduation date. Thus, the report of disbursement was the sole source of the necessary information with which OE could calculate and make a billing for premiums. It contained the amount of the loan, the date of disbursement and the date of anticipated graduation. OE sent two copies of the Loan Transaction Statement to the lender and recorded the date and amount of premiums billed each lender. The lender was to review the statement for accuracy and completeness. If there were any errors, the lender was to make the necessary corrections on the statement, return one copy to OE with its check for the premiums billed, and retain a copy for its records.

OE instructed the lender, in printed directions attached to each FLTS statement, to re-report any disbursements for which a premium billing was not included on the FLTS. Similar instructions were also contained in the Manual for Lenders.

Payment of the premiums was manually checked by OE personnel to be sure that all premiums billed were paid or proper corrections made. If payments were not forthcoming or if there were errors, OE would notify the lender and resolve any difficulties until proper payment was made. Payment of the premium was not entered in the Loan Control Master File in the computers because we

reviewing the affidavits and other supplemental materials, this Court finds that Plaintiff did not comply with the requirements of the FISLP in reporting loan disbursements, nor was it excused from compliance.

This Court heard arguments on Defendants' motion on June 15, 1981. As a result of the hearing an Order was entered on June 17, 1981, which, *inter alia*, required:

> That Plaintiff file with this Court any lender's disbursal manifest or other evidence of transmittal which may substantiate its contention that it was a business practice to transmit to Defendants a lender's manifest upon disbursal of each student loan at issue in Defendants' motion.

On July 2, 1981, Plaintiff submitted an affidavit of Rex Whaley and various Lender's Manifests. An uncontradicted affidavit of Gordon Jones reports that, in addition to the seventy-one Lender's Manifests filed by Plaintiff, the Defendants also possessed copies of twelve other Manifests Plaintiff previously had submitted to the Office of Education (OE). Mr. Jones reports that:

> I have examined each of these 83 Lender's Manifests and all of the other documents that Plaintiff has submitted. The 27 loans [at issue in Defendants' motion] ... are never mentioned at all in any of the documents.... While 306 of the 33 loans are listed on the 83 Lender's Manifests as conversions or paid-in-fulls, none are reported as disbursements.... None of these 83 Lender's Manifests reports a disbursement of any of the 333 loans at issue in this summary judgment motion.... Indeed, there are a total of only 117 disbursements reported on all 83 Lender's Manifests combined, but those are all for student loans other than those that are the subject of the summary judgment motion. Affidavit of Gordon Jones, p. 2.

Although there were two loans at issue for which disbursals were reported,[4] the coun-

---

would use the computer generated FLTS billing to assure that payment was made. Thus, if a disbursement was properly reported, the computer would produce a billing, and if there was a billing, OE would follow-up with the lender to make sure that the premium was paid.

      \*        \*        \*        \*        \*        \*

Because the billing for premiums was computer generated, no billing would be sent unless a disbursement was properly reported. Because each of these three transactions that could be reported on the Lender's Manifest was entirely separate and because OE relied exclusively on the accuracy of the information that the lender reported, the computer was not programmed to cross-check to make sure that a disbursement had been reported before a conversion or paid-in-full could occur. Thus, the fact that a lender reported a conversion or a paid-in-full without ever reporting a disbursement would not have been recognized by the computer. Moreover, such reporting of a conversion or a paid-in-full would not trigger the production of a premium billing.

4. As reported in the supplemental Statement of Rex Whaley, Plaintiff purchased many of the student loans in its portfolio from Technical Education Corporation (TEC). Some of the Lender's Manifests submitted by TEC were included in the submissions made pursuant to the Court's order of June 17, 1981. Mr. Jones reports:

> Two loans, one to James G. Maynard and one to James L. Tomblin, which were originally part of the summary judgment motion, are reported as disbursements on the first Lender's Manifest of the group of 13 from TEC. Although that Manifest is undated and unsigned, defendant United States has determined that these two disbursements were reported by TEC, that TEC was billed for payment of a premium, and that TEC paid the premium. As a result, the United States has withdrawn these two loans from its motion for partial summary judgment. None of the remaining 333 loans are mentioned on the 13 Lender's Manifests prepared by TEC. Affidavit of Gordon Jones, p. 3.

These loans do not support the contention that Plaintiff, as a business practice, properly reported disbursals of loans. Mr. Madden's affidavit states:

> OE required any lender which purchased FISLs from another lender, including a school-lender, to assure itself that disbursements had been reported and premiums paid by the seller, or to do so itself. Disbursements reported by a lender on loans that it later transferred were recorded by OE in the Loan Control Master File under the current holder's loan data. Affidavit of Ralph Madden, p. 4.

Thus, for loans which were not reported it was Plaintiff's responsibility to do so.

ter affidavits supplied by Plaintiff do not impress this Court that there remains any genuine factual question concerning Plaintiff's failure to pay insurance premiums or that such failure is attributable wholly to Plaintiff.[5]

In *American Bank of San Antonio v. United States*, 633 F.2d 543, 546 (Ct.Cl.1980) the Court in reviewing a claim to recover unpaid balances on student loans that had been issued under the FISLP stated:

> Although the regulations and other rules on which the government bases denial [of insurance proceeds] are often intricate, such rules are an essential aspect of the proper operation of a complex and widespread insurance program. They are especially important where, as here, the government, as insurer, has a large financial stake in the sound operation of the

participating lenders. We cannot conclude that, in fulfillment of his responsibility to provide careful federal supervision over the loan insurance program, the Commissioner was not entitled to establish these rules or to make compliance with them a condition of loan insurance. The reasonableness of requiring such compliance is confirmed by the fact that the plaintiff is a bank and therefore accustomed to dealing on a daily basis with state and federal banking and other regulations at least as involved as those governing the federal student loan insurance program.

In view of the undisputed facts in the present case, this Court finds the above rationale persuasive and holds that noncompliance with FISLP rules and regulations prevents, as a matter of law, the recovery

5. There are two counter affidavits. Mr. Whaley states:

> To the best of my knowledge and recollection, each of the attached Lenders Manifests bearing the name of Valley National Bank (Appendix A) was mailed to the Office of Education, Department of Health, Education and Welfare ("HEW"), pursuant to HEW procedures in effect at that time, in the ordinary course of business. Documents such as Lenders Manifests, emanating from the Loan Department, were placed in a mail tray utilized by Loan Department personnel. This mail was then placed in another tray for all outgoing mail and picked up by a U. S. Postal Service employee for delivery.
>
> While copies of Lenders Manifests other than those attached hereto have not been furnished to me, to the best of my knowledge and recollection, Lenders Manifests were prepared and submitted by the bank for each of the other student loans made by the bank under the same procedures and in the same manner as regards the attached Lenders Manifests.

The affidavit of Susan Cooper, loan clerk handling student loans, states:

> I forwarded to HEW such documents as the Student Application for Federally Insured Loan (OE Form 1154), Lender's Application for Insurance Claim (OE Form 1207), Promissory Note (OE Form 1164), Disclosure of Finance Charges (used in conjunction with OE Form 1164), and other documents requested by HEW for the processing of applications and claims under the student loan program. I am familiar with the particular form entitled Lenders Manifest for Federally Insured Student Loans (OE Form 1151), which is utilized by the lender to notify HEW that the

> proceeds of an approved student loan have been disbursed to the student or the school on his behalf. To the best of my recollection, each student loan application processed by the bank was reported to HEW on a Lenders Manifest. Because student loan applications were frequently submitted in groups and approved at approximately the same time, proceeds of student loans were similarly disbursed concurrently. Accordingly, it was the practice of the bank to report a number of disbursements on a single Lenders Manifest which provided for the listing of multiple disbursements. Affidavit of Susan Cooper, pp. 1–2.

The affidavit does little to show how the Plaintiff assured that disbursement were properly reported or how Plaintiff assured that loans disbursed by TEC were properly reported.

The Court is more impressed by what these affidavits omit. First, the affidavits of Whaley and Cooper are couched in terms of recollection and not positive statements of fact. Second, they do not address the loans at issue specifically in the context of whether these loans were properly reported as disbursed. Third, there is an overriding fact that demonstrates why the counter affidavits fail to raise a genuine dispute. That fact is that the *Manual for Lenders* requires a lender to re-report a loan disbursement if it does not receive billing for premium payment on the next Federal Loan Transaction Statement (FLTS).

> If the loan does not appear on the FLTS within 60 days after it is reported on the Lender's Manifest, OE Form 1151, the *Lender reports the loan again.* (Emphasis added.) *Manual for Lenders,* pp. III–15 to III–16.

of insurance proceeds on defaulted student loans where the noncompliance has any effect on the nonpayment of insurance premiums.

Plaintiff argues that actual disbursement of loan proceeds to student borrowers constitutes substantial performance of its contract and provides sufficient consideration for enforcement of HEW's loan commitment. Plaintiff also argues that any insurance premiums due HEW can be offset against the amount owed on its claims. The Court finds, however, that these arguments are not supported in the law. *American Bank of San Antonio, supra,* at 548.

### B. *Waiver and Estoppel.*

█ Plaintiff claims further that Defendants have waived any objection to payment of insurance proceeds on defaulted student loans because the nonpayment of insurance premiums was not relied upon by the Deputy Commissioner, Officer of Education, as a reason for denying Plaintiff's claims in the Department of Health, Education and Welfare's (HEW) final administrative decision on Plaintiff's claim. In a letter from Leo L. Kornfeld, Deputy Commissioner, dated January 13, 1978, to Rex Whaley, President of Valley National Bank of Huntington, HEW set forth five grounds upon which Plaintiff's claims for recovery of insurance proceeds were denied. The letter does not mention nonpayment of insurance premiums, specifically, as one of those grounds.[6] Plaintiff also contends that the paid claims brought into issue by

the Government's counterclaims were waived by payment and that payment constitutes "final action" by the HEW with respect to those claims. The law of this case and applicable regulations, as interpreted by persuasive authority, do not support these arguments.

First, this Court held in its Order of October 22, 1979, that the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* did not provide an independent basis for jurisdiction in this case and that Plaintiff had other adequate remedies to redress its grievances. Because the APA does not apply here, any contention that this Court should not affirm the final agency action on grounds other than that relied upon by the agency itself is based on authority inapposite to the present case. Second, the case of *Hicks v. Harris,* 606 F.2d 65, 67 (5th Cir. 1979) provides:

> Federal regulation prohibits any official, agent or employee of the Office of Education from waiving or altering any provision of the office's regulations or of any relevant statute except through amendment by publication in the Federal Register, and specifies that 'no action or failure to act on the part of such official, agent, or employee shall operate in derogation of the Commissioner's right to enforcement of said provisions in accordance with their terms.' 45 C.F.R. § 100a.483.

There have been no facts of waiver demonstrated in the present case that would satisfy the requirements of the regulation relied

---

**6.** The Court has reviewed this letter attached as Appendix "J" to the Statement of Rex Whaley. This letter states in pertinent part:

"In response to your letter of December 29, 1977, the following review of issues should clarify the Office of Education's denial of Valley National Bank's (VNB) claims. As indicated in my letter of December 23, 1977, evidence has been developed to support the fact that VNB abetted the Technical Education Corporation (TEC), St. Louis, Missouri, in circumventing provisions of the Federal Insured Student Loan Program (45 CFR 177), particularly those pertaining to securing federal insurance on student loans. The several provisions violated include:

1. Making loans by an ineligible lender (TEC);

2. *Disbursing loan proceeds prior to the issuance of insurance commitments*; (Emphasis supplied.)

3. Failing to exercise due diligence in the making, servicing and collecting of loans;

4. Making loans to ineligible students;

5. Failure of the school to pay student refunds in a timely manner."

The letter goes on to elaborate that Plaintiff (formerly VNB), under agency law, would be responsible for all defects arising from the actions of its agent, TEC. It is clear from the letter that Deputy Commissioner Kornfeld's main concern was Plaintiff's relationship to TEC. His letter does not however indicate that the provisions violated were all inclusive as to other defects which might exist as to insurance proceeds.

on by the Court in *Hicks*. Accordingly, this Court holds that there is no factual dispute in the present case concerning whether Defendants may be held to have waived payment of insurance premiums and that there has been no waiver thereof as a matter of law.

C. *Defendants' Right to Recover Wrongfully Paid Insurance Proceeds.*

■ Defendants have counterclaimed seeking to recover money erroneously paid on default claims and interest payments claims for student loans where insurance premium payments were not made. It is a well-settled principle that the Government has inherent authority to recover sums illegally or erroneously paid, and that it may not be estopped from doing so by the mistakes of its officers or agents. *United States v. Wurts*, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938); *Central Railroad v. United States*, 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399 (1896); *American Casualty and Surety Co. v. United States*, 526 F.2d 1127 (Ct.Cl.1975); and *American Fidelity Fire Ins. Co. v. United States*, 513 F.2d 1375 (Ct.Cl.1975). Thus, as to the loans at issue, the Court holds Defendants are entitled to recover the proceeds sought by their fourth and eighth counterclaims.

■ Plaintiff contends that recovery of a portion of the loan proceeds paid to it by Defendants is barred by the statute of limitations found in 28 U.S.C. § 2415(a). The six-year limitation period set forth in subsection (a) is inapplicable when the United States seeks to recover by counterclaim or

setoff; the applicable limitation is to be found in subsection (f) of 28 U.S.C. § 2415.[7] *See Simmonds Precision Products, Inc. v. United States*, 212 Ct.Cl. 305, 546 F.2d 886 (1976). Subsection 2415(f) does not constitute a time bar which would prevent recovery of the counterclaims and setoffs asserted by Defendants.

Because this Court is not impressed by the further contentions of Plaintiff, Defendants' motion for partial summary judgment is GRANTED.

## II. PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE'S ORDER

■ Initially, this Court determines that the Magistrate's Order of July 9, 1981, concerns a discovery matter which is subject to review by this Court pursuant to 28 U.S.C. § 636(b)(1)(A). The standard for review is as follows:

> A judge of the court may reconsider any pretrial matter . . . where it is shown that the magistrate's order is clearly erroneous or contrary to law. *Id.*

A. *The Scope of the Magistrate's Order.*

The Magistrate's Order considered six documents which Plaintiff sought to compel and to which Defendants objected as non-discoverable because of the attorney-client privilege. The Magistrate's Order found the six documents to be protected by the privilege and dismissed Plaintiff's claim that Defendants had put the privileged matters at issue through assertion of affirmative defenses and counterclaims. The Magistrate's Order assumed that the De-

---

7. Subsection (a) of 28 U.S.C. § 2415 states in pertinent part:

(a) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later . . .

Subsection (f) of 28 U.S.C. § 2415 states:

(f) The provisions of this section shall not prevent the assertions, in an action against the United States or an officer or agency thereof, of any claim of the United States or an officer or agency thereof against an opposing party, a co-party, or a third party that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. A claim of the United States or an officer or agency thereof that does not arise out of the transaction or occurrence that is the subject matter of the opposing party's claim may, if time-barred, be asserted only by way of offset and may be allowed in an amount not to exceed the amount of the opposing party's recovery.

fendant had put the privileged matter at issue through the affirmative defenses and counterclaims but found that production was not necessary for Plaintiff to adequately respond to those defenses and counterclaims. For reasons that follow, the Court is of the opinion that the Magistrate erred.

### B. *Plaintiff's Objections.*

■ Plaintiff asserts three objections to the Magistrate's Order. First, Plaintiff claims that any privilege which might have been claimed has been waived either because Defendants, (a) failed to raise timely objections to Plaintiff's requested discovery, and/or (b) placed the contents of the documents claimed to be privileged in issue. Second, Plaintiff claims that the documents withheld by Defendants constitute a portion of the administrative record of the decision denying Plaintiff's claim and are a unique source of the "real reasons" for denial. Third, Plaintiff objects on the ground that Defendants did not meet the burden of proof to support a claim of attorney-client privilege.

This Court in reviewing these objections is unimpressed by the latter two. So noted, this action is not one to review an administrative decision pursuant to the Administrative Procedure Act §§ 551 *et seq.* Plaintiff's second objection is without legal merit. Plaintiff's third objection is unavailing because the Magistrate's finding regarding the existence of privileged material was not clearly erroneous.

Plaintiff's first objection merits careful consideration. The Magistrate's Order did not make sufficient findings with respect to either of the subparts of this objection. There was no finding as to whether Defendants waived their objection concerning privilege and, further, the hypothetical discussion, as to whether Defendants put the privileged matters into issue by their pleadings, was in error on the basis of decisions relied upon. Accordingly, this Court reverses and remands for reconsideration.

### C. *Discussion for Remand.*

■ It is not clear from the record the extent to which subpart (a) of Plaintiff's first objection was argued below. If it were not properly presented to the Magistrate, then Plaintiff may be deemed to have waived this part of the objection.[8] If it were presented, however, the Magistrate's Order should have addressed it because Defendants may not ignore timely discovery requests, unilaterally, and then at a later time assert an objection.

> It is [the litigant's] responsibility either to answer the interrogatory or to object. In the absence of an extension of time, failure to object within the time fixed by the rule is a waiver of any objection. 8 Wright and Miller, *Federal Practice and Procedure* § 2173.

The court in *Sturdevant v. Sears, Roebuck & Co.*, 32 F.R.D. 426, 428 nt. 1 (W.D.Mo. 1963), stated that the mere filing for an extension of time does not stay the running of the time, nor extend the time, for the filing of objections. This waiver also applies to privileged matter. *United States v. 58.16 Acres of Land*, 66 F.R.D. 570 (N.D.Ill. 1958). *Contra Bohlin v. Brass Rail, Inc.*, 20 F.R.D. 224 (S.D.N.Y.1957).

■ The Court also directs consideration by the Magistrate of whether Defendants placed the alleged privileged communications at issue through the assertion of affirmative defenses and counterclaims. Essentially, this Court reads *Haymes v. Smith*, 73 F.R.D. 572 (W.D.N.Y.1976), and *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975) as recognizing an implied waiver occurs where the party asserting the privilege relies on advice obtained in the attorney-client relationship as a basis for the assertion of an affirmative defense or counterclaim. Thus, for example, where a party claims that it acted on the basis of legal advice and therefore the acts complained of cannot be considered as arbitrary or capricious, the opposing party is entitled to look beyond the

---

**8.** This Court has received copies of all briefs in the case and it appears that the matter was briefed below.

attorney-client privilege to discover if the legal advice was given and followed. In such a situation there is no need for an additional showing of necessity or other good cause. *See Virginia Electric Power Co. v. Sun Shipbuilding & Dry Dock Co.,* 68 F.R.D. 397, 410 (E.D.Va.1975).

### III. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION OF "CLASS A" AND DEFENDANTS' MOTION FOR DENIAL OF CLASS CERTIFICATION OF "CLASS B"

██ Plaintiff moved for certification of two classes in its complaint. In putative "Class A" Plaintiff proposed to represent all eligible lenders under the FISLP who were not afforded certain rights during Defendants' processing of claims. In putative "Class B" Plaintiff proposed to represent all eligible lenders which have submitted a claim under the FISLP that has been denied because Defendants applied criteria for payment beyond the scope of the pertinent regulations and the ordinary meaning of the terms therein.

Before this Court may certify a class, several findings are required. This Court, however, need not make all of these findings where class certification is found to be inappropriate for one or more reasons. Accordingly, this Court denies certification as to both proposed classes because of the provision of *Rule* 23(a)(4), Federal Rules of Civil Procedure, requiring that a representative party fairly and adequately protect the interests of the class.

It is evident from the record in this case that Plaintiff has undergone several changes of name in the past few years. Although this Court draws no inferences from this alone, Plaintiff acknowledges:

As a result of action taken by the State Banking Commission, Metro Bank was placed in receivership on September 12, 1980. Since that time, Metro Bank has ceased all commercial operations. The Federal Deposit Insurance Corporation is currently acting as the court-appointed receiver pursuant to the provisions of 12 U.S.C. § 1821. Plaintiff's Memorandum

of Points and Authorities In Support of Objections to Magistrate's Order of July 9, 1981, at p. 2, nt. 1.

It is clear that a prospective class representative who is in receivership and has ceased commercial operations may not have adequate financial resources to properly represent the class. A factor also to be considered is that the receiver is a regulator, as opposed to a regulatee, and many important issues relating to the proposed class involve rights of regulatees. Thus, a significant degree of antagonism between the prospective class representative and the putative class, predictably, is apparent and real.

Although there may be several other reasons for which class certification should be denied, the Court finds that the Plaintiff cannot fairly and adequately protect the interests of the proposed classes. Accordingly, Plaintiff's motion to certify classes and act as the representative is DENIED and Defendants' motion is GRANTED.