**CITIZENS SAVINGS BANK,**
**Plaintiff/Counterdefendant,**

v.

**Terrel H. BELL, United States**
**Secretary of Education, De-**
**fendant/Counterclaimant.**

No. C.A. 83–0567 S.

United States District Court,
D. Rhode Island.

March 25, 1985.

Letts, Quinn & Licht, Daniel Murray, Alan Flink, Robert D. Fine, Providence, R.I., for plaintiff, counterdefendant.

Richard K. Willard, Acting Asst. Atty. Gen., Saul Moskowitz, Office of the Gen. Counsel, Dept. of Educ., Michael F. Hertz, Stephen D. Altman, Russell B. Kinner, Attys., Civ.Div., Dept. of Justice, Washington, D.C., Everett C. Sammartino, Asst. U.S.

Atty., Providence, R.I., for defendant, counterclaimant.

## OPINION

SELYA, District Judge.

This case is an offshoot of the diverse, complex, and extensive litigation which marked the meteoric rise and precipitous fall of Lafayette Academy, Inc. (Lafayette). The ensuing flood of controversy has not only inundated Lafayette and its principals and successors in interest, but has also engulfed a myriad of financial institutions (the lenders) which provided loans to students or supposed students of Lafayette. This suit is but a small droplet in the raging torrent. It has been brought by one such lender against the Secretary of Education (the Secretary). Parenthetically, it seems appropriate to note that the United States Department of Education (Education) has long been part of the flotsam and jetsam left in Lafayette's roiling wake.

Lafayette, a now defunct correspondence school, eagerly embraced the federal Guaranteed Student Loan Program (GSLP), 20 U.S.C. §§ 1071–1087–4 (1978). That embrace, in turn, gave rise to the series of events which precipitated the instant action. In order to place this matter into proper perspective, an understanding and appreciation of the contours of the GSLP is helpful.

## I. THE PROGRAM

The GSLP was enacted by Congress in order to encourage eligible lenders to make low interest student loans to qualified borrowers enrolled in eligible post-secondary schools. 20 U.S.C. § 1071; 34 C.F.R. § 682 (1984).[1] Under the program, deserving pupils may enroll in courses of study at eligible educational institutions. They borrow the funds necessary to meet tuition and related payments from participating lenders. The students' repayment obligations are substantially deferred. Under the program, Education pays the interest on each loan until the borrower is required to begin repayment. In addition, Education pays a premium to the lender in the form of a special allowance, i.e., an interest supplement indexed to Treasury Bill rates, on the outstanding principal for the entire life of the loan.

The GSLP has two parts: the guarantee agency programs (GAP) and the Federal Insured Student Loan Program (FISL). 20 U.S.C. § 1071(a); 34 C.F.R. § 682.100(a). Under the GAP scheme, various state and private non-profit surety agencies guarantee lenders against default by any eligible borrower, and Education reinsures the agencies for 80 to 100 percent of the agencies' guaranteed payments to the lenders. 20 U.S.C. §§ 1077–78; 34 C.F.R. § 682.101. Under the FISL program, Education extends a conditional guaranty to the lender against default by the borrower. 20 U.S.C. §§ 1079–1082; 34 C.F.R. § 682.102. A lender may participate simultaneously in the FISL and in one or more of the GAP programs.

The interest and special allowance payments which Education makes on qualified loans are calculated from the principal balances as indicated on the lender's billings. 34 C.F.R. § 682.302(b). But, a lender participating in more than one of these programs only submits a single quarterly billing for the interest and special allowances due on the outstanding aggregate principal of all of its loans under the several programs. The billing format prescribed by Education, ED Form 799, does not segregate the lender's total portfolio either among the various GSLP sub-programs or on a school-by-school basis.

Upon receipt of a complete, timely, and accurate billing, Education approves payment based on the outstanding principal balance which appears on the billing form. 34 C.F.R. § 682.302(b). The invoice approval system does not provide for pay-

---

1. During the time of the events pertinent hereto, these regulations were codified as 45 C.F.R. § 177 (eff. October 21, 1979). *See* 44 Fed.Reg. 53,866 (Sept. 17, 1979). But, since they have remained intact in material part, the court will, for ease in reference, cite to them in accordance with the numerology of their latest recodification.

ment of less than the total amount requested by the lender; nor does it provide for payment based on less than the overall outstanding principal balance reflected on the form. If Education takes more than 30 days to authorize payment, it becomes liable for penalty interest at a rate which equals the nominal interest rate on the loans involved, plus the special allowance rate in effect for the billing period for each day beyond the 30 day period. 20 U.S.C. § 1087–1(b)(4); 34 C.F.R. § 682.304.

## II. BACKGROUND OF THIS LITIGATION

Lafayette, as an educational institution eligible for participation in the GSLP, made considerable federally-backed hay while the sun shone. But, the bubble eventually burst. On December 23, 1980, Lafayette pleaded no contest to a federal criminal information which included one count of filing false, fictitious, or fraudulent statements in violation of 18 U.S.C. § 1101, and one count of presenting false, fictitious, or fraudulent claims in violation of 18 U.S.C. § 287. Both counts related to criminal misconduct in Lafayette's processing of FISL applications for its students. Hot on the heels of the exposure of Lafayette's chicanery, the government began an all-out effort to recoup from the lenders the funds expended by Education in securing the FISL loans issued pursuant to Lafayette's complicity. The lenders, in turn, sought to compel Education to pay their claims for defaulted loans previously made on the basis of Lafayette's representations.

Citizens Savings Bank (Citizens or the Bank) filed its original suit for guaranteed payments on the defaulted Lafayette loans in October, 1981. *Citizens Savings Bank v. Bell*, C.A.No. 81–0670S (D.R.I.1981) (*Cit-*

izens *I* ). Education, which had twice previously requested Citizens to repay all of the interest, special allowance, and guaranteed payments it had received on all of its Lafayette student loans, denied liability and counterclaimed for the amounts it had earlier demanded. *Citizens I* was settled after protracted proceedings.[2] On September 13, 1983, Citizens filed this action. The suit covers a narrow sequence of events which occurred shortly before and after the filing of *Citizens I.* In brief, Citizens sought $41,372.51 in penalty interest for the alleged late payment of its September, 1981 billing and $9,960.89 in penalty interest for the alleged late payment of its December, 1981 billing. 34 C.F.R. § 682.-304(a). Education conceded that Citizens was and is entitled to ten days of penalty interest, $2,119.07, on its revised December billings, but denied liability for the balance of the Bank's claims. The Secretary counterclaimed for the penalty interest, $21,-248.28, which it asserts was mistakenly paid on Citizens' June, 1981 billing. The Bank disclaimed any obligation to refund that sum or any portion of it.

## III. FACTUAL PREDICATE

The underlying facts necessary for decision of the issues presently before the court are not in dispute. The court will endeavor succinctly to summarize those material facts. For ease in reference, the events pertaining to the June, 1981 billing should be viewed as somewhat removed, temporally and otherwise, from the later sequence of events anent the September, 1981 and December, 1981 billings.

### A. *The June Billing*

Citizens participated in both the FISL program and in a GAP conduit, the Rhode Island Higher Education Loan Program.[3]

---

**2.** The nature and terms of the *Citizens I* settlement are not material to the court's consideration of this case. *Citizens I* was still pending when this action was instituted, and it suffices to say that both the Bank and the Secretary agree that the disposition of *Citizens I* left open for judicial resolution the claims of the parties presently sub judice.

**3.** The Rhode Island Higher Education Assistance Authority (RIHEAA) was created by the Rhode Island General Assembly. *See* R.I.Gen. Laws §§ 16–57–1—16–57–19. A non-profit agency, RIHEAA guarantees loans and provides kindred support and succor for qualified Rhode Islanders attending public or post-secondary educational institutions, as contemplated by the federal GAP provisions.

All of the Bank's FISL loans were made to students who claimed to be enrolled at Lafayette. But, once Lafayette pled to the criminal counts, the status of the FISL loans made to its students was thrown to serious question. There then ensued a series of bureaucratic snafus of the ilk which form the stuff of satire.

On March 26, 1981, Education's Acting Deputy Assistant Secretary for Student Financial Assistance, James W. Moore, authorized Richard A. Hastings, the then-Director of the Division of Certification and Program Review (DCPR) in the Office of Student Financial Assistance (OSFA), to approve or deny guaranteed payments on Citizens' Lafayette student loans. Five days later, Hastings notified the Bank that Education had made a final decision denying Citizens' claims on those loans. On April 20, 1981, Hastings sent a detailed letter explaining the reasons for the decision and asking the Bank to repay all of the interest, special allowances, and guaranteed payments it had received on all of its Lafayette loans.[4]

On May 29, 1981, Hastings instructed Nat Coluzzi, Chief of the Guaranteed Student Loan Branch in the Division of Program Operations (DPO), to forward the Lafayette lenders' interest and special allowance billings to Gary Musselman, a program specialist in the DCPR, for review. Four days later, the student loan processing center (which is a private contractor headquartered in Norfolk, Virginia) was instructed not to process the Lafayette lenders' billings through the computerized billing process; these were likewise to be forwarded to Musselman. On or about June 30, 1981, DCPR orally informed Citizens that its Lafayette loans were not guaranteed, and thus ineligible for interest and special allowance payments.

Citizens submitted its June billing, that is, the single interest and special allowance invoice for the quarter ending June 30, 1981, on July 23, 1981. The figure listed on Form 799 for the outstanding principal included the amount of the Bank's defaulted Lafayette loans. Attached to the form, however, was a brief, unsigned cover letter, comprising two paragraphs. Its full text follows:

Enclosed is our bill for interest and special allowance for student loans for the quarter ending June 30, 1981. In accordance with our past practices, this bill includes both state and federal student loans. The federal student loan portion of this bill relates to loans to students of Lafayette Academy, Inc. The amount of interest on the bill allocated to those loans is $35.78. With respect to the special allowance, $535,848.53 of the average principal balance ($530,276.64 of the actual ending balance) represents the federal Lafayette loans and the balance is comprised of state student loans.

We were recently orally advised by representatives of the Department of Education to cease billing for student loans related to Lafayette Academy, Inc. Since this advice has not been reduced to writing and it is our position that we are legally entitled to be paid on these loans, we did not wish to prejudice our position by failing to send an appropriate bill at this time. If you wish us to follow any other procedure, please advise us in writing.

At some point, the student loan processing center lost Citizens' June billing. On September 29, 1981, Citizens resubmitted another signed original of the June billing, accompanied by the same letter of transmittal, to DPO personnel in Washington, D.C.

At least one of the pair of signed June billings flowed through bureaucratic channels without washing up on Musselman's desk. This elusive invoice was erroneously paid through DPO's manual billing process (without Musselman's authorization). On October 29, 1981, at the very time that the

---

**4.** This demand for repayment, and Citizens' claim for payment on $513,004.36 in defaulted Lafayette loans, formed the basis of *Citizens I.*

gulf between the parties was widening, Citizens received a check for $661,310.98, an amount which represented the total sum demanded in the June billing (including the amount requisitioned for the defaulted Lafayette loans). On October 9, 1981, the Department of Justice had notified Citizens that the government intended to sue for recoupment of all monies which the Bank had received from Education on its Lafayette loans. Repayment was again demanded. And, *Citizens I*, filed in this court on October 30, straightaway ensued.

On November 2, 1981, four days after it had received the vagrant payment from education and three days after it had filed *Citizens I*, the Bank proclaimed its entitlement to penalty interest on the entire June billing because of Education's failure to effect payment within 30 days after receipt. DPO personnel followed a mechanistic process which determined only whether a billing had been paid within the statutory period; they reflexively honored the Bank's request on November 17, 1981, without any examination of the merits of the imprecation. Citizens received $21,248.28 in penalty interest on November 27, 1981. But, back at the figurative ranch, Hastings, believing he possessed the only original June billing, informed Citizens' attorneys on November 6 that Education would effect no payment thereon unless and until the Bank submitted a billing stripped of any allusion to the Lafayette loans.

Education subsequently filed its counterclaim in *Citizens I* on December 24, 1981. The counterclaim requested the return of all the interest and special allowance payments which Education had made on Citizens' Lafayette loans. It included a prayer for the return of the interest and special allowance payment which had been made for the Lafayette loans on the June billing. However, the *Citizens I* counterclaim did not include a demand for the penalty interest which had been paid on November 27, 1981. That demand is presented by the Secretary's counterclaim in this action.

## B. *The September and December Billings*

On October 28, 1981, the day before payment on the June billing dropped unexpectedly into its corporate lap, Citizens submitted its invoice for the quarter ended September 30, 1981 (the September billing). Like the June billing, the September billing utilized Form 799 and encompassed the Bank's defaulted Lafayette loans as well as its state student loans. A replica of the unsigned cover letter which had been sent with the June billing accompanied this later proffer. And, thereafter, Citizens on January 15, 1982 submitted its billing for the quarter ended December 31, 1981 (the December billing). Despite the fact that Citizens had by this time received Hastings' November 6 letter, the balance listed in the December form amalgamated both the state student loans and the defaulted Lafayette loans. Once again, the same letter of transmittal was employed.

On January 22, 1982, Citizens wrote to OSFA requesting payment of the September billing. Shortly afterward, but before February 10, Musselman spoke with Kathleen Kennedy, the responsible Bank official, and informed her that Education would not pay any of the billings until the Lafayette loans were deleted. On February 10, Musselman and Citizens' counsel agreed that Citizens would thenceforth submit separate statements for its state loans and its federally-insured student loans. In addition, the statements for the FISL obligations would be subdivided between current and defaulted loans. And, these discussions and agreements were memorialized in a letter dated February 15, 1982. Three days later, Citizens submitted recast September and December billings which contained only the state student loans. Musselman received the revised billings on February 26, 1982 and that same day authorized Carl O'Reilly, GSLP Branch Chief, DPO, OSFA, to pay the amounts requested thereby.

On March 24, 1982, DPO's processing unit oversaw issuance of the payment draft in respect to the corrected September ac-

count. Citizens then demanded $41,372.51 in penalty interest, based on the date that the original September billing had been received by Education. The Bank's revised December billing was inexplicably delayed in processing. Education did not authorize payment until April 7, 1982, ten days beyond the due date. On April 9, 1982, Citizens demanded $9,960.89 in penalty interest based on the date that the seminal December billing had been received by Education. Education has refused to pay both of these demands for penalty interest, but concedes that Citizens is due $2,119.07 (ten days of penalty interest) on the revised December billing.

Since February 18, 1982, Citizens has submitted separate interest and special allowance billings for its FISL and state student loans, respectively. And, Education has honored the state student loan billings in a timely fashion.

## IV. POSTURE OF THE CASE

In the first count of its complaint in this action, Citizens prays for an award of $41,372.51, representing penalty interest on the state student loan portion of the original September billing. In Count II, the Bank seeks $9,960.89 in penalty interest on the state student loan portion of the original December billing. In both instances, penalty interest, as Citizens computes it, runs from the thirty-first day next following the date that Education received the invoice in question. As noted above, Education concedes that Citizens is entitled to ten days of penalty interest ($2,119.07) in connection with the revised December billing, but disclaims further liability. The defendant's counterclaim looks to the recovery of the penalty interest ($21,248.28) erroneously (in the government's view) paid on the initial June billing.

The parties have cross moved for summary judgment. Fed.R.Civ.P. 56. Each motion is accompanied by affidavits and documentary proffers. The parties have repeatedly acknowledged that the pertinent facts are undisputed. The basic issue is, and always has been, whether a lender may receive penalty interest on a GSLP billing which includes loans that Education has theretofore determined not to pay. In a chambers conference held on the record on December 13, 1984, the parties agreed that the court should address the pending motions, and the attachments filed in conjunction therewith, as comprising a case stated. Neither party sought to introduce additional evidence or to present any witnesses preliminary to such a determination. When oral argument was heard in January of 1985, both parties stipulated that this court, on the record at hand, would treat with the controversy pursuant to Fed.R. Civ.P. 52(a). And, there is nothing to prevent the court from doing so. *See Federacion De Empleados Del Tribunal v. Torres*, 747 F.2d 35, 36 (1st Cir.1984) (where parties agreed to submit matters as case for decision on the merits, district court's factual inferences would be set aside only if clearly erroneous); *Vetter v. Frosch*, 599 F.2d 630, 632 (5th Cir.1979) (applying Rule 52(a) in ruling on cross motions for summary judgment where case could be treated as tried on a stipulated record); *Starsky v. Williams*, 512 F.2d 109, 111 (9th Cir.1975) (same). Accordingly, this rescript comprises the court's findings of fact and conclusions of law as required by Rule 52(a).

## V. ISSUES PRESENTED

Citizens' position is predicated on three alternative theorems. The Bank argues, first, that its requests for interest and special allowance payments were accurate, timely, and complete as defined by the governing statute and regulations and the interpretations thereof promulgated by the government. And, the Bank urges, inasmuch as the Secretary never entered a "final decision" to deny the Lafayette-originated claims, their inclusion by Citizens in its submittals did not contaminate the accounts. As a final string to its bow, the Bank expostulates that the defendant ought to be estopped from claiming that the plaintiff did not follow FISL and GSLP program requirements because Education

paid the June billing and the penalty interest for that quarter. For much the same reasons, the Bank opposes the government's counterclaim.

The Secretary contends, both offensively in support of his counterclaim and defensively in opposition to the plaintiff's complaint, that the June, September, and December billings, and each of them, were inaccurate and inadequate under the controlling regulations; and that the plaintiff received penalty interest referable to the June account by reason of clerical mistake, and should disgorge the erroneously obtained premium.

The court will consider each of these asseverations seriatim.

## VI. THE MERITS

### A. *The Accuracy of the Billings*

In enacting 20 U.S.C. § 1082(a), Congress delegated to the Secretary of Education, inter alia, the authority to:

(1) prescribe such regulations as may be necessary to carry out the purposes of this part....

(3) include in any contract for federal loan insurance such terms, conditions, and covenants relating to repayment of principal and payment of interest, relating to his obligations and rights and to those of eligible lenders, and borrowers in case of default, and relating to such other matters as the Secretary determines to be necessary to assure that the purposes of this part will be achieved; and any term, condition, and covenant made pursuant to this clause or any other provisions of this part may be modified by the Secretary if he determines that modification is necessary to protect the financial interest of the United States....

(5) enforce, pay, or compromise, any claim on, or arising because of, any such

insurance or any guarantee agreement under section 1078(c) of this title; ...

Pursuant to this authority, the Secretary has promulgated regulations specifying the procedures to be followed by program participants and delineating their rights and responsibilities. *See* 34 C.F.R. § 682.

The protocol for special allowance payments appears in 34 C.F.R. § 682.302, which provides in pertinent part as follows: [5]

(a) *General.* The Secretary pays a special allowance to lenders on all GSLP loans. The special allowance is equal to a percentage of the average unpaid balance of principal, including capitalized interest, for all GSLP loans a lender has held during a 3-month period. The 3-month periods end (1) March 31; (2) June 30; (3) September 30; and (4) December 31 of each year.

(b) *Lender's reports.* To receive the special allowance payment, a lender shall submit periodic reports to the Secretary stating the average unpaid balance of principal for all its GSLP loans. The reports must be in a form prescribed by the Secretary....

(d) *How does the lender determine the average unpaid balance of principal?* ...

(i) *The average quarterly balance method.* Add the unpaid balance of principal of all loans outstanding on the first day of the 3-month period and the unpaid balance of principal of all loans outstanding on the last day of the period and divide by 2....

(3) For the purpose of this determination, a loan is considered outstanding if—

(i) The borrower has not repaid the loan;

(ii) The lender has not received payment on a claim for loss on the loan; and

---

**5.** The regulations provide two alternate methods for computation by the lender of the average unpaid principal balance for purposes of the special allowance: the "average quarterly balance method," 34 C.F.R. § 682.302(d)(1)(i), and the "average daily balance method," 34 C.F.R. § 682.302(d)(1)(ii). Inasmuch as Citizens re-

sorted to the former in preparing its submissions, no useful purpose would be served by a description of the mechanics of the latter. A lender "may not change its method of determining the average unpaid balance of principal without the prior approval of the Secretary." 34 C.F.R. § 682.302(d)(2).

(iii) The lender has not been advised that the Secretary or a guarantee agency has finally refused a claim for loss on the loan.

And, penalty interest payments for lenders are contemplated by 34 C.F.R. § 682.304(a), which holds:

If the Secretary has not authorized the United States Department of the Treasury to pay either interest benefits or special allowance within 30 days after receipt of an accurate, timely, and complete request for payment from any lender, the Secretary pays that lender an increased payment known as penalty interest.

Both the statutory mosaic and the regulations, as from time to time amended, are expressly incorporated as terms of the contract of insurance which was executed by and between Citizens and Education on June 29, 1972 (and which remain in full force and effect at all times material hereto).

■ Education's interpretation of these regulations tracks the plain language of the regulations and is easily analyzed. If the Secretary has finally refused a claim of loss with respect to a given loan, the loan cannot be considered outstanding. Moreover, if the loan is not outstanding, the principal owed thereon cannot be included in the aggregate unpaid balance of principal of all loans outstanding for purposes of the special allowance. From there it is but a tiny step to Education's argument that a billing which on its face reflects a different amount as the unpaid balance of principal for all loans outstanding is "inaccurate." And, once a billing is established to be inaccurate, the lender is debarred from penalty interest thereon by reason of the fair implication of 34 C.F.R. § 682.304.

■ This court finds the government's reading of the regulations to be eminently reasonable. 34 C.F.R § 682.302(d)(3)(iii) makes it crystal clear that a loan which has not been repaid (or upon which a claim for loss has not theretofore been paid) is considered "outstanding" only if, and to the extent that, "(t)he lender has not been ad-

vised that the Secretary ... has finally refused a claim for loss on the loan." The negative pregnant which comprises the flip side of the regulatory coin is undeniably that a loan as to which the Secretary has made a final decision to deny payment may not be classified as "outstanding;" and, therefore, may not be included in the billing. In light of this plain language, any other interpretation is merely a paralogical exercise in tergiversation. Furthermore, Education's interpretation of its own guidelines is entitled to substantial deference. *E.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service Inc.,* 689 F.2d 1112, 1117 (1st Cir. 1982). Generally, such an interpretation is given controlling weight unless the reviewing court determines it to be clearly erroneous or inconsistent with law. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Cheshire Hospital,* 689 F.2d at 1117, *Grand Islander Health Care Center, Inc. v. Heckler,* 573 F.Supp. 405, 410 (D.R.I.1983). And, such respect is particularly appropriate in complex and highly specialized areas where the regulatory net has been intricately woven. Medicare reimbursement is such an area. *E.g., Cheshire Hospital,* 689 F.2d at 1117; *Grand Islander,* 573 F.Supp. at 410. So, too, is the arcane world of GSLP financing. In such a field, "[m]atters of accounting, unless they be the expression of a whim rather than an exercise of judgment, are for the agency." *Cheshire Hospital,* 689 F.2d at 1117. *See also Hospital San Jorge v. Secretary of Health, Education and Welfare,* 616 F.2d 580, 589 (1st Cir.1980) (Campbell, J., concurring).

It is not for the courts to meddle in such obvious agency prerogatives as the choice of forms and procedures for reimbursing lenders, at least without compelling cause. As the First Circuit has noted, "[w]here Congress is silent, common sense suggests that the less important the question of law, the more interstitial its character, the more closely related it is to the every day admin-

istration of the statute and to the agency's administrative or substantive expertise, the less likely it is that Congress wished the court to remain indifferent to the agency's views." *Constance v. Secretary of Health and Human Services*, 672 F.2d 990, 995–96 (1st Cir.1982).

■ The court recognizes that the deference due to an agency's interpretation of its governing statute and regulations is far from blind allegiance. A reviewing court should not "slip into a judicial inertia" or mindlessly "rubberstamp" the agency. *See Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). The true measure of the deference due depends on the persuasive power of the interpretation, given the totality of the attendant circumstances. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Mayburg v. Secretary of Health & Human Services*, 740 F.2d 100, 105–06 (1st Cir.1984). Yet here, in a context where the question is intricately related to the agency's area of special expertise and where Education's experience both in administering the GSLP and in calibrating the ministerial needs of program operation are invaluable, the measure of the deference is high. And, because the regulations in question flow rationally from the statute, and the agency's reading of the regulations is a commonsense one, there is no compelling reason adequate to support judicial interference.

■ Citizens was informed of Education's final decision to deny guaranteed payments anent the Lafayette student loans on March 31, 1981, almost four months before the Bank prepared and forwarded its June billing. That information was reinforced by Hastings' letter of April 20, 1981 and by the oral representations made by Education officials at a meeting held on June 30. Citizens' July 23 cover letter makes it plain that the Bank knew that payment had been denied on the loans. By the time Citizens prepared its September billing, it not only had the information limned above, but had also received the October 9 letter from the Department of Justice (threatening to sue unless the special allowance and guaranteed payments already made on Lafayette loans were rebated). And, when the December billing was formulated, Citizens was in possession of Hastings' November 6, 1981 letter (warning that the June billing would not be paid until the Lafayette loans were deleted). The Bank's actions in filing suit in *Citizens I* during this period further bespeak its certain knowledge of the Secretary's intransigence vis-a-vis the Lafayette loans.

Having in mind the clear administrative instruction not to include loans as to which the Secretary has explicitly refused repayment, 34 C.F.R. § 682.302(d)(3)(iii), the unexpurgated June, September and December billings, all of which included the interdicted items, were unmistakably inaccurate—and Citizens knew it. Viewed in that light, none of the original billings were adequate to platform an impost of penalty interest under the terms of 34 C.F.R. § 682.304.

■ Citizens, in a lame effort to confess and avoid, argues that its billings were accurate because the letters of transmittal which accompanied the accounts explained the inclusion of the Lafayette loans. Thus, if the Secretary had wished to do so, Citizens' thesis runs, Education could have calculated the correct outstanding principal balance based on the incremental information contained in the cover letters. This proposition is specious at best.

34 C.F.R. § 682.302(d) explains in some detail how to compute the outstanding principal balance figures which are to be entered on the form. The regulation explicitly states that loans which have been unconditionally disclaimed by the Secretary do not belong in the compilation. In turn, 34 C.F.R. § 682.302(b) mandates that billings be submitted "in a form prescribed by the Secretary." Citizens not only placed the wrong information on the form, but added its own gloss to the stipulated procedure by including a cover letter which would have required Education officials to process its

billing in a completely different manner than that contemplated by the regulations. In effect, the Bank seeks to fashion a new breed of billing form, self-tailored to meet its perceived needs. But, chaos lies in that direction.

The Secretary has a right to insist upon strict compliance with his reasonable regulations of general application, a right which rises to paramount importance as the scope and complexity of the administrative undertaking escalates. Citizens' unilateral change in the set procedure flouted the realities of administering the involuted GSLP infrastructure. A comprehensive audit program is plainly needed in order to verify the accuracy of payments and the integrity of the lenders' requisitions. This need was heightened when the Lafayette fiasco surfaced. Further checks and balances were prudently devised by the Secretary. In this computerized age, cost-efficient operation of the governmental function demands uniformity in presentation. As one Education official has persuasively sworn, if the Secretary routinely accepted and processed billings which were at odds with the rules or depended upon unauthorized extraneous materials, or allowed lenders to utilize nonstandardized forms, or paid less than all of the amounts requested on the billings, the auditors' task would be hopelessly confounded and complicated logarithmically. Once the Secretary curtsies to the idiosyncratic preferences of individual lenders, the regulations lose all meaning and the quest for uniformity is doomed to certain failure. And, Education would, in such circumstances, be hoist on its own petard: the task of deciphering payment instructions on a case-by-case basis would virtually ensure that the agency run afoul of its self-imposed regulatory pledge to pay accurate billings within a thirty day span.

The regulations at issue here closely track the statutory imperatives, possess a rational basis, and are reasonably related to the due accomplishment of the goals of the legislation and of the underlying administrative scheme. The Bank's lament is, on this score, little more than an ill-considered invitation to permit Citizens to profit from blatant disregard of the established procedures. It is an invitation which this court will neither honor nor accept.[6]

### B. *The Finality of the Secretary's Refusal*

Citizens, in a feeble lunge to avoid the cutting edge of 34 C.F.R. § 682.-302(d)(3)(iii), argues disingenuously that the Secretary's disclaimer of responsibility on the Lafayette loans could not have been "final" inasmuch as (i) the Department left the door open for further discussion of the matter, and (ii) the issue eventually proceeded to litigation in *Citizens I.* This court has reviewed Education's communications to the Bank. What Citizens sees as the Secretary's willingness to discuss the matter is more accurately described as a willingness to explain his position than to change it. (This is particularly true in light of Education's repeated instructions not to bill the government for the Lafayette loans.) With due respect to Rodgers and Hammerstein,[7] the Bank's effort to portray the Secretary as being "just a guy who cain't say 'no'" rings hollow to the trained ear.

There certainly is nothing in the regulations themselves to suggest that 34 C.F.R. § 682.302(d)(3)(iii) refers to a final determination made by a judge after litigation; common sense militates strongly to a contrary view. The language of the provision itself speaks of a situation where "the Sec-

---

6. Citizens also claims that it included the defaulted loans on Form 799 to preserve its litigation position in *Citizens I.* Even if given credence, it is difficult to see how this strategem affects the accuracy *vel non* of the billings. In any event, the Bank had ample alternatives; it could, for example, simply have deleted the defaulted Lafayette loans from the billings and stated in the cover letters that it was doing so under protest and without prejudice to its contention that the loans were entitled to trigger interest and special allowance payments.

7. The paraphrase is taken, by judicial license, from the song "I Cain't Say No," from the musical comedy "Oklahoma!," Act I. (Music by Richard Rodgers, lyrics by Oscar Hammerstein II, New York: Williamson Music, Inc., 1943).

retary or a guarantee agency has finally refused a claim...." *Id.* Such a regulation requires only that the agency take a last-ditch stand. *Cf. Mayburg,* 740 F.2d at 108 (such "words require that the Secretary take a final position on a contested matter.") (discussing 42 U.S.C. § 405(g)). In this instance, the Secretary firmly shut the door. There was nothing ambiguous, equivocal, tentative, or uncertain about his position anent the Lafayette loans; it was administratively "final" in any and every meaningful sense of the word. Education regarded it as such, and the Secretary's interpretation of his own regulation is deserving of respect. *E.g., Cheshire Hospital, supra; Grand Islander, supra.* And, as pointed out above, *see* text *ante* at Part VI(A), Citizens knew that the refusal was the agency's last word on the topic—and acted upon that knowledge.[8]

The Bank's claim that the Secretary's declination of liability for the Lafayette loans was not a "final" refusal lacks any vestige of merit.

## C. *Estoppel*

In its caudal effort to forestall the result which the regulatory framework appears ineluctably to demand, Citizens protests that the Secretary should be estopped from enforcing the regulations with respect to the Lafayette loans. The centerpiece of the Bank's contention in this regard is that the government in fact paid the original June billing and the request for penalty interest thereon. And, the Bank points to this same sequence of events as a de facto capitulation and assent to Citizens' continued inclusion of the Lafayette loans as part and parcel of its billing forms for September and December.

The Supreme Court, though turning a deaf ear with some regularity to claims of estoppel against the government, has not entirely foreclosed the possibility; the Court has, to the contrary, carefully eschewed decision of whether any, and if so what precise type of, conduct by a government agency would suffice to estop the government from insisting upon compliance with a valid regulation. *See Heckler v. Community Health Services of Crawford County, Inc.,* —— U.S. ——, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *Immigration and Naturalization Service v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (per curiam); *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam); *Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973) (per curiam); *Montana v. Kennedy,* 366 U.S. 308, 314–315, 81 S.Ct. 1336, 1340–1341, 6 L.Ed.2d 313 (1961). While the Court has recently declared itself hesitant "to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor and reliability in their dealings with their Government," *Heckler,* 104 S.Ct. at 2224 (emphasis original), it has left no doubt that the government cannot be estopped on the same terms as a private litigant. *Id.* at 2224; *Hibi,* 414 U.S. at 8, 94 S.Ct. at 21. Furthermore, the Court has expressed lingering concern that the public interest could be hamstrung if estoppel were allowed to operate against the government. "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler,* 104 S.Ct. at 2224. Thus, all courts have "the duty ... to observe the conditions defined by Congress for charging the public treasury." *Hansen,* 450 U.S. at 788, 101 S.Ct. at 1471. *See also Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

---

**8.** Indeed, in *Citizens I,* the Bank specifically alleged that it "submitted claims to defendant [the Secretary] with respect to the student loans in default [the Lafayette loans]," and that the Secretary "has refused and continues to refuse to pay the claims submitted...." *Id.,* Plaintiff's Complaint at ¶ 9–10. *See also id.* at ¶ 11.

Consonant with the prudential precepts which underscore these indistinct guideposts, the federal courts have consistently found that estoppel will not lie to prevent the government from enforcing the student loan statutes and regulations in accordance with the tenor thereof. *See, e.g., Hicks v. Harris,* 606 F.2d 65, 68 (5th Cir.1979); *American Savings v. Bell,* 562 F.Supp. 4, 8–10 (D.D.C.1981); *Federal Deposit Insurance Corp. v. United States,* 527 F.Supp. 942, 949 (S.D.W.Va.1981). These cases comport with the strong national interest in the even-handed application of the student loan paradigm and in the integrity of the regulatory format.

■ Assuming for the sake of argument that estoppel will lie against the government at all in these precincts, a claimant must at the least satisfy the traditional elements of an estoppel. *Heckler,* 104 S.Ct. at 2224. The First Circuit has identified four relevant integers which must be factored into any such equation: (i) acts or omissions of government officials tantamount to affirmative misconduct; (ii) the claimant's reliance thereon to its detriment; (iii) the reasonableness *vel non* of such reliance; and (iv) the risk, through estoppel, that a government official will, in effect, waive congressionally enacted public policy. *Best v. Stetson,* 691 F.2d 42, 44 (1st Cir.1982).[9] Citizens' case falters on each and all four of these fronts.

■ At worst, the official statements and actions anent the matters at bar sent some conflicting signals. Though the June billing and the penalty interest attributable thereto were mistakenly paid, those payments occurred against a background of repeated governmental denials of fiscal liability, coupled with governmental threats to sue. There was nothing to suggest that the June billing should have included reference to the Lafayette loans; in fact, quite the opposite was true. *See* text *ante* at Part VI(A). Viewed realistically, the Secre-

tary's miscue in effecting payment of the June billing was at most tantamount to negligence; and it is settled beyond peradventure that governmental carelessness, without more, cannot rise (sink?) to the level of affirmative misconduct which is required to catalyze an estoppel against the United States. *United States v. Ven-Fuel, Inc.,* 758 F.2d 741, 761 (1st Cir.1985); *Simon v. Califano,* 593 F.2d 121, 123 (9th Cir.1979). The same holds true of the slapstick Laurel-and-Hardy routine practiced by Education in this case.

Moreover, it is clear that the decision to include the interdicted borrowings in the account originated with Citizens and antedated the conduct of which the Bank now complains. And, the Bank prepared and forwarded the nonconforming September billing before it received the errant payment on the June requisition. Thus, dubiety attends the question of whether (and if so, how) the Bank relied to its detriment on Education's acts or words. The Supreme Court's language in *Heckler* seems peculiarly appropriate:

> Respondent did receive an immediate benefit as a result of the double reimbursement. Its detriment is the inability to retain money that it should never have received in the first place. Thus, this is not a case in which the respondent has lost any legal right, either vested or contingent, or suffered any adverse change in its status. When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position. Here respondent lost no rights but merely was induced to something which could be corrected at a later time.

*Heckler,* 104 S.Ct. at 2225.

The *Heckler* shoe fits the facts at bar neatly: Citizens was never entitled to prompt payment of the original billings, nor to the inadvertent penalty payment.

**9.** *Best* predated the Supreme Court's decision in *Heckler,* and it is at least arguable that the Court has by implication raised the barrier erected by the First Circuit to an even higher plateau. But, because the Bank in this case cannot scale even the *Best* hillock, the court leaves for another day the ultimate inquiry as to whether *Heckler* has rendered the terrain more mountainous.

There can be no legitimate detriment in returning what never rightfully belonged to the lender. The situation is one which can readily be corrected.

Citizens' further asseveration that the mistaken payment induced it to continue including the Lafayette loans on Form 799 is likewise bootless. As noted above, the Bank prepared the September billing on October 28, 1981—one day before it received the June payment and several weeks before the penalty payment was made. And, when Citizens prepared the December billing (in January, 1982), it was in possession of Hastings' November 6 letter instructing the Bank not only to delete the Lafayette loans, but requesting the return of the erroneous special allowance and interest payments on the loans. Thus, it is simply not plausible that the Bank was in any way misled by, or relied to its detriment on, the Secretary's bevue. And, if and to the extent that Citizens did so rely, such reliance was plainly unreasonable.

Lastly, the invocation of estoppel in this instance could, in effect, waive congressionally enacted policy. It is definitely adverse to the public interest to prevent the government from recovering its own funds simply because they were mistakenly paid out. It is similarly impolitic to allow the participants in a complex reimbursement plan unilaterally to superimpose their own understanding of the procedure upon the entire scheme. Where so much money and so many lenders are involved, the public has a particular interest in an orderly and efficient reimbursement process. That interest would be disserved by requiring the United States to provide individualized attention of the genre Citizens implicitly demands. It would likewise be disserved by ceding a trouvaille to an intractable lender because of a relatively harmless bureaucratic error.

The Bank's estoppel argument is meritless.

## VII. CONCLUSION

At oral argument, learned counsel for Citizens spoke eloquently and at length as to concepts of "fundamental fairness." There is, in this court's view, nothing unfair about insisting that an institutional lender which seeks to partake of the government's pie adhere strictly to the etiquette of reasonable regulations of general applicability. Although the Secretary may have been less than artistic in the shuffling of the paperwork anent the Lafayette loans, it would be inequitable to permit Citizens to benefit from that bureaucratic shortfall. More to the point, the governing law is clear; and a straightforward application of the law to the facts at hand dictates that the Bank, save only with respect to the comparatively tiny amount of incremental penalty interest conceded by the government, endure defeat on the merits.

Because penalty interest was mistakenly paid on the June billing, the government is entitled to prevail on its counterclaim and to recover the money so expended ($21,248.28). See American Bank of San Antonio v. United States, 633 F.2d 543, 553, 224 Ct.Cl. 482 (1980); Federal Deposit Insurance Corp., 527 F.Supp. at 949; Knoxville Business College v. Boyer, 451 F.Supp. 58, 62 (E.D.Tenn.1978). And, inasmuch as the Bank filed inaccurate billings in October, 1981 and January, 1982, Citizens is not eligible to receive penalty interest thereon under 34 C.F.R. § 682.304(a).

Citizens' corrected September billing was filed in February of 1982. It was paid within thirty days, as required by law. Thus, no penalty interest attaches as to that requisition. The defendant has conceded, however, that the government was tardy (to the extent of ten days) in honoring the Bank's revised December account; Citizens is therefore, entitled to penalty interest for that period in the sum of $2,119.07.

Though not raised by the parties, questions impliedly arise as to whether (i) the government is entitled to prejudgment interest on the return of the June overpayment, and (ii) the Bank is entitled to further interest on the overdue penalty interest referable to the corrected December billing. These questions must be deter-

mined under general precepts of federal common law, as there is no particular statutory directive in point. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 6, 92 L.Ed. 3 (1947); *Royal Indemnity Co. v. United States*, 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361 (1941); *Segal v. Gilbert Color Systems, Inc.*, 746 F.2d 78, 82–83 (1st Cir.1984). Justice Black has put a gloss on the relevant analysis, as follows:

[A] persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained.

*Rodgers*, 332 U.S. at 373, 68 S.Ct. at 7.

 In this case, each party has, in effect, had the use of the other party's funds for some period of time. Common sense suggests that each has put the money to work for its own benefit. *Cf. United States v. Ven-Fuel, Inc.*, 764 n. 20. The amounts in controversy are liquidated. Given the milieu of the litigation, and the plain congressional intent that overdue payments anent student loan obligations bear interest as between the lender and the Secretary, *e.g.*, 34 C.F.R. § 682.304, prejudgment interest is appropriate on both facets of this case, so that the aggrieved parties may "be fairly compensated for the loss." *Rodgers*, 332 U.S. at 373, 68 S.Ct. at 7. An even-handed weighing of the "relative equities," *id.*, requires no less.

The court, therefore, in the exercise of its discretion, *cf. Segal*, 746 F.2d at 83; *Earnhardt v. Puerto Rico*, 744 F.2d 1, 3 (1st Cir.1984), awards prejudgment interest: (i) to the government on its counterclaim from December 14, 1983 (the date upon which the counterclaim was filed in this court) to the date hereof, and (ii) to the

plaintiff on its successful claim for $2,119.07 from September 13, 1983 (the date upon which it instituted the suit) to the date hereof. The rate of interest, absent statutory directive, is left to the court's discretion. *See EEOC v. Wooster Brush Co. Employees' Relief Association*, 727 F.2d 566, 579 (6th Cir.1984); *Donovan v. Freeway Construction Co.*, 551 F.Supp. 869, 881 (D.R.I.1982). In each such instance, the court fixes 9.09 percent as the most appropriate rate for computation of prejudgment interest in this case. *Cf.* 28 U.S.C. § 1961(a) (post-judgment interest, last published rate, as computed by the Administrative Office of the United States Courts).

The parties shall compute their respective interest entitlements (simple interest, not compounded) and shall jointly prepare and present to the court for entry on April 9, 1985 at 8:30 a.m. a form of order and judgment in conformity herewith.