DECISION
This action involves an appeal by Carmine Olivieri from a decision of the Administrative Adjudication Division of the Department of Environmental Management (DEM). Olivieri seeks reversal of DEM's July 29, 1997 decision finding that he violated the Freshwater Wetlands Act.
The subject site, located in West Greenwich, contains a swamp/pond complex, a stream which is less than ten feet wide on average, a perimeter wetland, and two riverbank wetlands. A cartpath which runs through the site is an undeveloped earthen roadway approximately eight feet wide on average. At a certain point this path becomes Rhode Island dam # 468.
To the east of the cartpath lies a large pond; to the west is a swamp, greater than three acres in area. A concrete structure carries flow from the pond beneath the cartpath to the swamp. After a westerly bend in the cartpath, there is a crossing stream. Dena Gonsalves, a senior natural resource specialist in the Enforcement Section of the Division of Freshwater Wetlands, indicated that over a number of years water from the pond flowed through the cartpath, a term that Gonsalves used interchangeably with "dam," to the swamp on the other side of the cartpath.
On September 1993, a Notice of Intent to Enforce (NOI) was issued to Boston Neck Realty Corp., at that time the owner of the site. (On August 25, 1994, the property was conveyed to Modern Boating, Inc., of which Olivieri is president.) The NOI was issued because Gonsalves, in an earlier site inspection, had determined that the stream channel had been excavated in order to remove a beaver dam, leaving debris along the sides of the stream channel.
During a site inspection in April of 1994, Gonsalves again noticed that the stream had been recently excavated to remove a beaver dam. Soil had again been placed along the sides of the channel. The dimensions of the channel were approximately four feet deep by three feet wide. A site inspection by Gonsalves in July revealed further excavation of the stream crossing, with debris along the sides of the channel, making it very steep and in need of stabilization.
On August 3, 1994, the Division of Freshwater Wetlands received a letter of authorization from John R. Assalone, president of Boston Neck Realty, Corp., designating Olivieri to act on its behalf in the discussions with the Division. On August 14, 1994, Gonsalves met with Olivieri at the site to discuss restoration. She told Olivieri that the slopes of the channel needed to be graded back, seeded, and mulched with a mat of loose hay. Olivieri insisted that he had to be able to drive a vehicle across the path.
Subsequent to the August 11th meeting, Olivieri received permission from DEM to fill two feet of the four foot depth of the stream in order to gain access across the water course but still allow water from the pond to flow through the cartpath to the swamp.
On or about August 29, 1994, Gonsalves again visited the site and found that the restoration had not been done in conformance with DEM's directives; rather, the stream channel had been filled to the top of the cartpath, well beyond the designated two-foot level.
On November 21, 1994, Gonsalves, Harold Ellis, the enforcement supervisor for the Division, and Olivieri met the property. The fill within the stream channel was then one foot below the top of the cartpath, probably as a result of erosion or water flowing across the surface, but water still flowed across the partially filled ditch/stream. Gonsalves and Ellis determined that since the channel appeared relatively stable and still allowed water to escape the pond, thereby acting as an emergency overflow for the dam, adequate restoration had been accomplished. Olivieri then stated that he desired to do some additional work. Because rain had damaged the road, he wanted to prevent any water from flowing across the cartpath in the area of the stream crossing. Ellis, however, informed Olivieri several times that in order to do that work, a permit from the Wetlands Division would be required. Ellis reiterated that admonition in a December 2, 1994 letter to Olivieri, expressly addressing and contradicting Olivieri's contention that the contemplated work was "maintenance" of the dam and not exempt from permit requirements:
 "Contrary to what you expressed in the field, the proposed activity of raising the grade of the cartpath to stop the overflow of water is not maintenance activity in our Rules and Regulations. As such, any further work proposed in and/or adjacent to the restoration area shall require a Permit from this Division . . . . Please also note that approval is required from this Division to manipulate the water level in the Pond."
A site visit on December 14, 1994 revealed that the premises were essentially in the same condition as that approved in the November on-site meeting, and therefore the property appeared to be in compliance with the NOI. A different picture was presented on September 29, 1995, when Sean Carney, a natural resource specialist, visited the site in response to a telephone complaint received by DEM. Carney observed a large backhoe excavating a portion of the pond area near the concrete culvert outlet structure. Carney also noticed that clearing and filling in both the pond and swamp area, had occurred and that material had been placed in the stream channel. Further along the cartpath Carney noticed filling, clearing, and grading within the swamp and perimeter wetland area. A Cease and Desist Order was issued to Olivieri on that day.
Compared to her last visit on December 14, 1994, Gonsalves noted that the stream crossing area had been filled to the top of the cartpath and that there was additional work along the sides of the cartpath as well as to the north and northwest area of the stream crossing. Fill had been deposited in the stream channel and into the pond, thereby raising and widening the cartpath/dam. Other filling and grading had been done, and large fill piles had been stored at the end of the cartpath in the swamp and perimeter wetland.
A month later, November 6, 1995, Carney returned to the site and discovered that Olivieri had ignored the Cease and Desist Order. Further alterations had occurred, and additional fill had been placed in the perimeter wetland at the end of the cartpath. Carney recommended that a Notice of Violation and Order (NOV) be issued. An NOV was subsequently prepared and issued on November 21, 1995, and penalties were assessed for each violation.
Before issuing the NOV, Ellis took into account his own knowledge of the site, Carney's reports, aeriel photographs, Gonsalves' reports, along with all of the Division's files on the matter. He also reviewed provisions in the Rules and Regulations Governing the Administration and Enforcement of the Freshwater Wetlands Act ("Wetlands Regulations") relating to exempt activities and determined that the alterations at the site exceeded the limitations set forth in the regulations. He also determined that no application had been submitted for the alterations.
The NOV alleged that Olivieri altered or permitted alterations of freshwater wetlands in five instances without having first obtained DEM approval, ordered restoration of the wetlands, and imposed a Five Thousand Dollar administrative penalty. After a full adjudicatory hearing, the hearing officer determined that Olivieri had violated the Freshwater Wetlands Act by:
1. Filling into a 100-foot Riverbank Wetland and into a Swamp/Pond Complex, resulting in the unauthorized alteration of approximately 160 square feet of wetland;
2. Filling into a Stream, resulting in the unauthorized alteration of wetland by restricting flow in the Stream and causing impoundment of water in the adjacent Pond;
3. Filling into a 100-foot Riverbank Wetland and into a Swamp/Pond Complex, resulting in the unauthorized alteration of approximately 400 square feet of wetland;
4. Filling and clearing within a Swamp/Pond Complex, resulting in the unauthorized alteration of approximately 5,800 square feet of wetland; and,
5. Filling into a Perimeter Wetland resulting in the unauthorized alteration of approximately 3,900 square feet of wetland;
Olivieri was directed to restore the freshwater wetlands and to pay the administrative penalty. The Director of DEM subsequently adopted the findings of fact and the conclusions of law submitted by the hearing officer, thereby rendering a Final Agency Decision and Order, from which the instant appeal arises.
The Superior Court's review of an agency's decision is controlled by R.I.G.L. § 42-35-15(g), which provides in pertinent part:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency as to the credibility of witnesses or the weight of the evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Review is limited to determining whether the record contains substantial evidence to support the agency's decision. Newport Shipyard v. R.I. Commission for HumanRights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is relevant evidence which a reasonable mind might accept as adequate to support a conclusion. Id. at 897, even if the court, after having reviewed that evidence, might be inclined to view the evidence differently than did the agency. Berberian v. Dept.of Employment Security, 414 A.2d 480, 482 (R.I. 1980). Factual conclusions of administrative agencies invite reversal "only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council434 A.2d 266, 272 (R.I. 1981). Questions of law, however, are not binding upon a reviewing court and may be freely reviewed. Carmody v.R.I. Conflicts of Interests Commission, 509 A.2d at 458. The Superior Court is obliged to uphold the agency's findings and conclusions if they are supported by competent evidence. RhodeIsland Public Telecommunications Authority, et al. v. R.I. LaborRelations Board, et. al. 650 A.2d 479, 485 (R.I. 1994).
Olivieri contends that the DEM Hearing Officer's finding — that R.I. Dam #468 is not an "approved" structure as contemplated in section 6.03 of the Wetlands Regulations — was clearly erroneous, arbitrary, capricious and an abuse of discretion. In support of this argument, Olivieri asserts that the original plan for that dam prescribes the grades and elevations to be maintained in order to protect the integrity of the dam. He claims that these calculations from the baseline at which the dam must be maintained. According to Olivieri, his work conformed to those specifications articulated on the original diagram provided to him by DEM. This, by his definition, constitutes maintenance rather than alteration.
Earl F. Prout, Jr., DEM's Dams Safety Inspector and keeper of dam records, testified that Olivieri's reliance on the original plans was erroneous. After having reviewed the plan submitted by Olivieri, Prout concluded that the plan appeared to be an in-progress drawing. There was no record that any other or final drawing had ever been submitted. Nicholas Pisani, an engineer, testified that from his review of the plan the elevation of the dam could not be determined. "[I]f I was a contractor trying to build that structure," concluded Pisani, "I'd go back to the design engineer and start asking questions."
Olivieri presented no expert testimony to contradict DEM's assertion that the "as built" plans were unreliable blueprints for the dam. Although the "original plans" of Rhode Island Dam #468 may have been submitted to the Department's predecessor, the Division of Harbors and Rivers in 1954, the record is bereft of any evidence which establishes approval of either the plans or the accompanying application. Olivieri also suggests that although the dam was built prior to DEM's existence, the Department somehow holds out the structure as a state regulated and classified dam. He further asserts that DEM altered the plans for the dam after it came under question and that DEM has no knowledge of the procedure by which plans for dams were approved when the subject dam was erected. The Court disagrees.
A review of the record discloses no reliable expert testimony in support of Olivieri's propositions. Plainly, Olivieri's own testimony that he relied on these "as built plans" was unpersuasive. Indeed, he acknowledged at the hearing that he had been advised by DEM, even before he began any work, that problems existed with these plans. In any event, the issue devolves to one of fact, peculiarly within the scope of the agency's determination. Such factual determinations are accorded fair deference by a reviewing court if there is legally competent evidence within the record in support thereof. EnvironmentalScientific Corporation v. Durfee, 621 A.2d 200, 207-208 (R.I. 1993); Barrington School Committee v. Rhode Island State LaborRelations Board, 608 A.2d 1126, 1138 (R.I. 1992). The record below adequately supports DEM's conclusions and does not invite a contrary result.
Olivieri further argues that the hearing officer erred in finding that the water flowing through the cut in the dam is a stream rather than a ditch, rejecting his contention that this breach in the dam is a ditch resulting from unauthorized excavation and decades of erosion. Were it found to be a ditch, Olivieri contends that he would necessarily be required to return the dam elevation to its original grade as an emergency maintenance measure. The original grade which he references is based on his interpretation of the "as built plans." As earlier indicated, however, reliance on these plans is misplace.
Suggesting that the hearing officer's decision was arbitrary and erroneous, Olivieri targets that portion of the decision which references Gonsalves' testimony "that in 1970, the area was simply acting as an 'emergency spillway, ' but that in her opinion, she felt that it also met the definition of a 'stream, ' even though it was not subject to a constant flow of water."
The Wetlands Regulations define Stream/Intermittent Stream" to mean:
 "any flowing body of water or watercourse other than a river which flows during sufficient periods of the year to develop and maintain defined channels. Such watercourses carry groundwater discharge and/or surface runoff. Such watercourses may not have flowing water during extended dry periods but may contain isolated pools or standing water."
This definition does not require constant flow of water in order to categorize a particular body as a stream. The Wetlands Regulations simply require "flow during sufficient periods of the year to develop and maintain defined channels."
As the hearing officer stated in her decision, "Ms. Gonsalves, Sean Carney and Harold Ellis, all qualified as experts in wetlands ecology, . . . testified that the cut in the dam met the definition of a stream under the 1994 Wetlands Regulations." This Court finds no compelling reason to fault the hearing officer's conclusion that the evidence produced by DEM was persuasive. While the deference due to an agency interpretation of its governing statute and regulations is far from blind allegiance, Bureau of Alcohol, Tobacco Firearms v. FederalLabor Relations Authority, 464 U.S. 89 (1983), it is given controlling weight unless the reviewing court determines it to be clearly erroneous or inconsistent with the law. Citizens Sav.Bank v. Bell 605 F. Supp. 1033 (1985) (citing Udall v. Tallman,380 U.S. 1, 16-17 (1964); Cheshire Hospital v. NewHampshire-Vermont Hospitalization Service Inc., 689 F.2d 1112
(1st Cir. 1982). This Court finds that the hearing officer's conclusion was not clearly erroneous.
Olivieri additionally contends that the work he did at the property was maintenance intended to restore the dam structure to its original dimensions; and, as such, it did not amount to alterations of the freshwater wetlands. Therefore, he claims he was exempt from permit requirements under the wetlands regulations. He asserts that he made several requests to DEM regarding what activity would be considered maintenance rather than alterations. He also argues that DEM failed to provide him with this information, thus creating an emergency situation to which he was obliged to respond. The record reflects clear evidence, however, from DEM agents as well as from Olivieri himself regarding his having been notified by DEM that the proposed measures to repair the dam were not maintenance and that they required a permit.
Olivieri conceded that he had cut down trees, stockpiled the cuttings, performed grading, cleared vegetation, and removed fill from the pond and relocated it to another section of the property. He further acknowledged that he had been notified by DEM representatives that in order to perform the activities, he was first required to obtain a permit. Nothwithstanding such admonitions and despite having been forewarned that his actions were not maintenance procedures and therefore required a permit, Olivieri nonetheless proceeded without DEM authorization.
Even if it were an "approved structure," the work done on the dam did increase the structure both horizontally and vertically, in direct contravention of applicable statutory provisions. G.L. § 6.03 (1956). The hearing officer's interpretation of the agency's own regulations should be accorded a fair modicum of weight unless the reviewing court determines it to be clearly erroneous or inconsistent with law. Udall v.Tallman, 380 U.S. at 16-17.
Review of the record below reveals that the evidence presented amply supports the agency's decision, which did not amount to an abuse of discretion. The decision was neither arbitrary, capricious nor clearly erroneous, and is hereby affirmed. Counsel for DEM shall prepare an appropriate form of judgment for entry in the court records.