**In re ACCESS TO CERTAIN RECORDS OF RHODE ISLAND ADVISORY COMMITTEE ON THE CODE OF JUDICIAL CONDUCT.**

No. 93–370–M.P.

Supreme Court of Rhode Island.

March 8, 1994.

**1064**

Joseph V. Cavanagh, Jr., Michael DiBiase (Blish & Cavanagh), Providence, for petitioner.

Lauren E. Jones, Providence, for amicus curiae.

## OPINION

MURRAY, Justice.

This case came before this court pursuant to a petition filed by the Providence Journal Company (the Journal) for access to an advisory opinion issued by the Rhode Island Advisory Committee on the Canons of Judicial Ethics (committee). This committee was renamed the Rhode Island Advisory Committee on the Code of Judicial Conduct when the court adopted a new code on March 8, 1993. The Journal also seeks such documents as requests or exhibits upon which the advisory opinion was premised. We grant the request in part and deny it in part.

The original provision creating the Rhode Island Advisory Committee on the Canons of Judicial Ethics was established pursuant to Judicial Canon 31(D) of former Supreme Court Rule 48. Subsequently the Supreme Court adopted the Code of Judicial Conduct, which replaced the Canons of Judicial Ethics. The Rhode Island Code of Judicial Conduct was based upon the Model Code promulgated by the American Bar Association in 1990. In adopting the new code, this court continued to provide for an advisory committee on the Code of Judicial Conduct without significant change in its function. The present code provision reads as follows:

*Advisory Committee on the Code of Judicial Conduct*

"In order to assist judges in complying with the foregoing canons, an advisory committee has been appointed by the Supreme Court with authority to interpret the canons and to provide an opinion upon the request of any judge concerning a proposed action and its propriety in the light of said canons. The advisory committee consists of five (5) members of the judiciary, not more than two of whom may be from the same court. The advisory committee will give the inquiring judge an opinion in respect to the propriety or impropriety of the judge's proposed action. *An opinion from the advisory committee that it is proper for the judge to take certain action will give rise to a conclusive presumption that the judge has acted properly. Any judge who acts in accordance with an opinion given by the advisory committee shall be presumed to have abided by the Canons of The Code of Judicial Conduct.*" (Emphasis added.) Rhode Island Supreme Court Rules Article VI.

The committee was designed to provide a vehicle by which Rhode Island judges could obtain authoritative interpretations of the Canons of Ethics or the Code of Judicial Conduct concerning the propriety of their actions. A judge who seeks a conclusory opinion from the committee and follows that opinion is presumed to have abided by the Code of Judicial Conduct. The committee has not, to this point, published its opinions. Since the rule contains no specific provision concerning confidentiality, this opinion will set important precedent. At this point it will be the only precedent upon which future conduct of the committee will be based.

The Journal has requested a copy of an advisory opinion issued to Justice Antonio Almeida (Almeida), a former member of the Superior Court, together with Almeida's request for the opinion and any supporting documentation. The substance of the Journal's request and its brief suggests that the Journal has obtained information concerning the nature of Almeida's request. The Journal contends that since Almeida is no longer a member of the Superior Court, he has no further interest, in terms of either reputation or privacy, in the advisory opinion. Therefore, the Journal contends, the advisory opinion should be released, along with all other accompanying correspondence and documents, pursuant either to a common-law

right to inspect and copy judicial documents or under the Access to Public Records Act (APRA), G.L. 1956 (1990 Reenactment) chapter 2 of title 38.

The members of the committee and the Rhode Island Trial Judges Association have expressed opposition to the release of advisory opinions or supporting materials. The committee's position is set forth in a letter memorandum written by one of its members and endorsed by all other members.

"I do not believe that opinions by the Advisory Committee should be made public. Even if opinions are issued in a sanitized form it will be very easy to identify the judge concerned. It is crucial to the effectiveness of this committee, that judges feel free to seek counsel and guidance without fear of disclosure. Failure to guarantee such privacy will be counterproductive. It will have a chilling effect on judges' use of the committee and will be a disservice to both the bench and the public it serves."

The committee suggests that the purpose of the rule establishing it, and authorizing it to render opinions constituting a "safe harbor" for the judge who abides by the opinion, is to encourage judges to seek guidance from the committee. The committee suggests that there are often complex situations in which the application of the Canons of Ethics or of the present Code of Judicial Conduct may not be clear. The committee avers that publication of the request or the advisory opinion will deter judges from seeking advice. Consequently the committee contends that the purpose of the rule would be frustrated, if not entirely eroded.

The Rhode Island Bar Association (Bar Association), has submitted a brief as amicus curiae. The Bar Association's brief recommends that the committee publish its opinions, as long as the inquiring judge or other parties involved in either the request or the opinion remain anonymous. In view of the fact that the committee has not published any of its opinions, the Bar Association suggests that prior advisory opinions be published in a redacted form. This would eliminate any identifying information, thus preserving the anonymity of all the parties involved.

The Bar Association recommends that this court be guided by a rule adopted by the Ethics Advisory Panel (panel), which was established by Article V, Rule 9.1 of the Supreme Court Rules of Professional Conduct. The panel was established to provide guidance to members of the bar who seek interpretation of the Rules of Professional Conduct. Those rules govern the obligations and responsibilities of attorneys. Unlike the committee the panel adopted a rule that addresses the issue of confidentiality. Rule 6 of the Rules of the Ethics Advisory Panel provides:

"The name and letter of an inquiring attorney, the Panel's proceedings considering requests for advice and the advisory opinion letter to the inquiring attorney shall be confidential. The advisory opinion and the facts (excluding the identity of parties) on which it is based shall not be kept confidential but shall be proper subjects for publication."

The Bar Association contends that the committee, although it has not promulgated a written rule, has in practice accorded complete confidentiality to the entire advisory opinion process. It suggests that this unwritten "rule" of confidentiality for prior advisory opinions is entitled to substantial deference. *See Citizens Savings Bank v. Bell,* 605 F.Supp. 1033 (D.R.I.1985); *Lerner v. Gill,* 463 A.2d 1352 (R.I.1983).

The Journal argues that in the absence of an explicit rule requiring confidentiality, the committee's opinions are public documents under APRA and are not excluded by the exemption contained in § 38–2–2(d)(20). Section 38–2–2(d)(20) excludes records of judicial bodies from the definition of public documents except records produced by those bodies in their administrative function. The Journal argues that the term "administrative," though not defined in APRA, refers to the exercise of executive authority. The Journal avers that the committee, in furthering the function of the Supreme Court in its disciplinary role, is exercising an administrative function.

The Bar Association counters by contending that the committee performs a judicial

function "in its role as arbiter of the ethical propriety of a judge's anticipated conduct." The Bar Association further contends that the extent of the right to the disclosure of judicial acts is not unlimited. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598–99, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570, 580–81 (1978). It further asserts that privacy interests not only may outweigh the public's right to know but may in an appropriate case also outweigh even a constitutional right of access. *See Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *In re The Knoxville News–Sentinel Co.,* 723 F.2d 470 (6th Cir.1983).

The Journal and the Bar Association cite statutes and/or rules of other states in respect to disclosure or nondisclosure of the opinions and work product of similar advisory committees in various jurisdictions. The Journal cites statutes and/or rules in Arkansas and Georgia that require publication of advisory opinions without provision for anonymity of the requesting party. The Journal also cites statutes and/or rules in New York, Texas, South Carolina, and Florida that provide for public disclosure of advisory opinions that protect the anonymity of the requesting judge and in some instances delete the names of other parties.

The Bar Association cites the Maine rule, which requires publication but provides for confidentiality. Additionally the Bar Association points to the Massachusetts rule, which authorizes a similar advisory committee to "publish its opinions but the name of the judge requesting the opinion and any other identifying information shall not be included in a published opinion unless the judge consents to such inclusion." We have also reviewed rules in several other states not mentioned by either party.

■ We need not determine whether the advisory opinions are subject to APRA. We choose to concentrate on the common-law right of access to judicial records.

> "[T]he right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and *access has been denied where court files might have become a vehicle for*

*improper purposes.* " (Emphasis added.) *Nixon,* 435 U.S. at 598, 98 S.Ct. at 1312, 55 L.Ed.2d at 580.

> "It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. * * * *[T]he decision as to access is one best left to the sound discretion of the * * * court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.*" (Emphasis added.) *Id.* at 598–99, 98 S.Ct. at 1312–13, 55 L.Ed.2d at 580.

Therefore, we exercise our discretion in resolving this issue. We are persuaded that a balance must be struck, with regard to prior opinions issued by the committee, between the interest of the public in the disclosure of the opinions and the interest of the inquiring judicial officer in confidentiality. *See generally Doe v. Prudential Insurance Co. of America,* 744 F.Supp. 40 (D.R.I.1990). Those judges who sought advice from the advisory committee in the *past* did so with the expectation of confidentiality. That expectation is entitled to substantial deference and should not be eroded. Those advisory opinions issued prior to the publication of this opinion should be released in redacted form. Those opinions should not disclose the identity of the requesting party or the identities of other parties to whom reference was made in the request or in the advisory opinion. The nature of the request should be disclosed in a redacted manner sufficient to form a basis for the advisory opinion that has been sought.

■ With regard to advisory opinions issued after the publication of this opinion, this court is of a different conviction. We are persuaded that any present judge who receives advice from the committee with assurance that such advice, if acted upon, gives that judge a *conclusive presumption* of having abided by the Code of Judicial Conduct should expect that the decisions of the committee and any pertinent data are public record. If this conclusive presumption were not accorded to the requesting judges, we

might be of another mind. In view of the significant advantage given the judge, when we weigh this presumption against the public interest in the advisory opinion, public interest weighs in favor of disclosure.

The Journal suggests that the present Code of Judicial Conduct grants a "safe harbor" to a judge who follows the advice of the committee. We view what the Journal describes as a safe harbor as more akin to an island fortress. We believe that a conclusive presumption of proper behavior is a powerful incentive for requesting an advisory opinion. While granting a judge such an incentive, we cannot ignore the public's interest in these advisories. The public's scrutiny must be accorded the same deference given to judges, because the public has, however realistically or unrealistically, high expectations for its judges.

We are mindful that along with this disclosure, which the court determines to be in response to the public interest, arises a concomitant responsibility on behalf of the media.

"A *responsible* press has always been regarded as the handmaiden of effective judicial administration * * *. Its function in this regard is documented by * * * [a record] of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." (Emphasis added.) *Sheppard v. Maxwell*, 384 U.S. 333, 350, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600, 613 (1966).

The media must be wary that a miscarriage of justice may also occur when unsubstantiated allegations or innuendos are used unfairly or unscrupulously to harm a judge's reputation. A responsible news medium scrutinizes; it does not unjustly or irresponsibly incite a wildfire of insinuation.[1]

"[A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." *Bridges v. California*, 314 U.S. 252, 270–71, 62 S.Ct. 190, 197, 86 L.Ed. 192, 207 (1941).

Consequently, all future advisory opinions should be published in unredacted form. Additionally, if requested, any supporting documentation or any underlying data upon which the advisory was based should be released in unredacted form. This procedure ensures that all members of the Judiciary will have the benefit of the opinions of the committee, which will ultimately form a body of interpretative rulings. These rulings will assist

---

1. We believe the Code of Ethics, adopted by the Society of Professional Journalists in 1926 and revised in 1973, 1984, and 1987, to be enlightening in defining the ethical duties of journalists and others involved in the news media. The code states in pertinent part:

"I. Responsibility:
Journalists who use their professional status as representatives of the public for selfish or other unworthy motives violate a high trust."
"III. Ethics:
" * * *
"(3) So-called news communications from private sources should not be published or broadcast without substantiation of their claims to news values."
"IV. Accuracy and Objectivity:
"(1) Truth is [the] ultimate goal.
"(2) Objectivity in reporting the news is another goal that serves as the mark of an experienced professional. It is a standard of performance toward which we strive. We honor those who achieve it.
"(3) There is no excuse for inaccuracies or lack of thoroughness.

" * * *
"(5) News reports should be free of opinion or bias and represent all sides of an issue."
"V. Fair Play:
Journalists at all times will show respect for the dignity, privacy, rights, and well-being of people encountered in the course of gathering and presenting the news.
" * * *
"(2) The news media must guard against invading a person's right to privacy.
"(3) The media should not pander to morbid curiosity about details of vice and crime."
"VI. Mutual Trust:
Adherence to this code is intended to preserve and strengthen the bond of mutual trust and respect between American journalists and the American people."
This court believes that these highlighted sections, and the entire code of ethics, accurately define the professionalism we would expect, and in fact the public should demand, from a responsible media.

members of the Judiciary, the public, and academia in an understanding of the present code.

In respect to the Journal's specific request, it is denied insofar as it seeks the opinion issued to former Justice Almeida, along with his letter of request and other supporting documents. It is granted insofar as the committee will ultimately publish a redacted opinion that will outline the nature of the request without disclosing the identity of the requesting party or other parties to whom reference was made in the course of the request. With regard to all advisory opinions issued subsequent to the publication of this opinion, they must be published in unredacted form, and if requested, any supporting documentation upon which the advisory was based should also be released.

For the reasons stated, the petition of the Journal is granted in part and denied in part. This opinion will be transmitted to the committee with directions to publish its past and future opinions in a manner consistent with the instructions contained herein.

FAY, C.J., did not participate.

LEDERBERG, Justice, concurring.

I concur with the majority's decision to publish future opinions of the Advisory Committee on the Code of Judicial Conduct (committee) for the reasons set forth in the opinion and, additionally, for the reasons that follow.

The Constitution of the State of Rhode Island (Constitution) embodies the noble tenets of public service by declaring that "The people of the State of Rhode Island believe that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable and responsive, avoid the appearance of impropriety and not use their position for private gain or advantage." R.I. Const. art. 3, sec. 7. In order to assist in achieving these reasonable and reassuring goals, the Constitution endows an ethics commission with authority to adopt a code of ethics whose rules shall apply to "[a]ll elected and appointed officials and employees of state and local government."

*Id.* at sec. 8. Accordingly, all public officials and employees, including judges, are bound to comply with these ethics rules and statutes. But, judges in addition must conform their conduct to the standards set forth in the Canons of the Code of Judicial Conduct. Article VI of the Supreme Court Rules.

The Code of Judicial Conduct (code) applies to all officers of the judicial system in state courts (including, for example, magistrates and masters) as well as to all judges of Probate, Municipal, and Housing Courts in the cities and towns. Canon 5 A of Art. VI of the Supreme Court Rules. Thus, the jurisdiction of the committee extends well beyond the class of state judges.

When a public official seeks advice from the ethics commission regarding a potential conflict-of-interest, the response to that request is published with identification of all parties. If we were to require less of judges who consult the committee, we might appear to afford judges greater protection than that afforded other public officials who similarly attempt to comply with ethical rules when they seek advice from the ethics commission. Publication of the committee's work will serve to increase accountability by public officials who enjoy life tenure. Because the canons of the code are "rules of reason" and because the code is to be construed so as not to impinge on the essential independence of judicial decision-making, Rule 1 of Art. VI, the publication of the efforts that judges make to maintain standards of ethical conduct will increase public confidence in judicial decisions. "We must never forget that the only real source of power that we as judges can tap is the respect of the people." Thurgood Marshall, *Judges Must Strive for Neutrality*, Chicago Tribune, Aug. 15, 1981, at 7.

To date, the committee has issued about ninety advisory opinions. The opinions issued by the committee between 1983 and mid–1990 have, in fact, been published in redacted form by the American Judicature Society. *The Digest of Judicial Ethics Advisory Opinions*, 478–83 (Debora L. Solomon ed. 1991). Nationwide, the issue that garners the most advisory activity in other states' judicial advisory committees pertains to judges who seek advice on whether they

should be disqualified from hearing a case. *See* Vivi Dilweg *et al., Modern Judicial Ethics* 53 (National Judicial College 1992). In our state, such recusal issues have accounted for about 12 percent of all inquiries to the committee. *See Digest of Judicial Ethics Advisory Opinions* at 478–83. The impact of recusal on court operations has been cogently described by the United States Supreme Court in its recently revised policy which delineates the circumstances under which those justices will hear cases when parties before the Court are represented by law firms in which members of the justices' families are employed. Uneasy that "[e]ven one unnecessary recusal impairs the functioning of the Court," the Court worried that "strategizing" recusals could become a common occurrence caused by litigants who would select "law firms with an eye to producing the recusal of particular Justices." Statement of Recusal Policy, Supreme Court of the United States, November 1, 1993.

Although the identification of parties in published advisory opinions may deter judges from seeking advice on strictly personal, family, or health-related matters whose revelation would not likely serve a public purpose, requests in these areas do not appear to be frequent. Of the approximately ninety inquiries from judges to the committee in the past ten years, most have concerned three areas: thirty-five (about 40 percent) have sought guidance on the appropriateness of the inquiring judge's attending events as a guest or an honoree; twenty-three (about 26 percent) have asked whether the inquiring judge's membership on a committee, board, or organization would violate the code; and nine (about 12 percent) sought advice on recusals. Speculation that the committee may uniformly permit the requested activity, and thus routinely furnish a safe harbor from charges of ethical violations, is unfounded. In fact, the committee advised against the putative conduct in one-third of the inquiries, after determining that the proposed activity would violate the code; in two-thirds of the inquiries the committee found no violation of the code by a judge's potential action. *Id.*

Overall, the ethical principles in our Constitution and the premises of the Code of Judicial Conduct would be served by publication of the committee's decisions, and in consequence the competing though essential interests of judicial independence and judicial accountability can be balanced.

SHEA, Justice, dissenting.

The only issue raised in the petition before the court is whether the advisory opinion requested by former Justice Almeida from the Rhode Island Advisory Committee on the Code of Judicial Conduct (committee) and all supporting documents relating to it should be released. The majority seizes on this narrow, specific request as an opportunity to order that all advisory opinions issued to date be published with names deleted and that all future requests, opinions, and supporting documents be published in toto. Because I believe the majority is addressing issues not properly before the court and because today's holding will have a significant chilling effect on any judge consulting the advisory committee for advice, I dissent.

All past inquiries and advisory opinions, including the purported request and opinion relating to Justice Almeida, should remain confidential. The inquiring justices' expectations of confidentiality must not be violated by this court without the inquiring justices' permission. As to the status of all future advisory requests and opinions, that discussion should be referred to the committee with directions that it formulate appropriate rules for submission to this court for approval. Those new rules could then be debated, adopted, and published following consultation with all interested parties.

We recently took such action, in conference, regarding ambiguities that have arisen about certain provisions of the Rules of Professional Conduct for Attorneys. Such a reasoned and well-considered approach would be no less appropriate in this situation.

The committee was first established in 1974 by a rule of this court. It was intended to assist judges in the interpretation of and compliance with the Canons of Judicial Ethics, particularly in areas where the canons themselves or their application to the situa-

tion facing the judge gave rise to ambiguity. The committee's interpretation of the canons, and the policy of confidentiality it adopted, is entitled to substantial deference and great weight since the adoption of a policy of confidentiality was not clearly erroneous nor was it contrary to law. *Citizens Savings Bank v. Bell,* 605 F.Supp. 1033, 1041 (D.R.I.1985). Furthermore, this court was fully aware of that policy of confidentiality. It has enjoyed the approval of this court until today. Complete confidentiality in the committee's proceedings has been so generally known and recognized that a fair presumption arises that the parties, in entering into their engagements, did so with a silent reference to the custom, and tacitly agreed that their rights and responsibilities would be determined by it. *See Fletcher & Brothers v. Seekell,* 1 R.I. 267 (1849). Reasonable customs observed over time can and should acquire the force of and become part of the law. *See Trott v. Wood,* 24 F.Cas. 218 (C.C.D.R.I. 1813) (No. 14,190).

I would also remind the court of other action taken by us quite recently in issuing an order on March 8, 1993, adopting Rule 4 of Article VI of the Supreme Court Rules of Judicial Conduct. Those rules create and define the purpose and power of the Judicial Performance and Evaluation Committee. Recognizing that "[t]he courts, the public, and the bar have a vital interest in a responsive and respected judiciary," the drafters of the rule nevertheless limited disclosure of the judicial evaluations to the judge evaluated and the presiding judge of the court on which the judge serves. Supreme Court Rules Art. VI, Preamble to Rule 4; Rule 4.3. Surely the public's interest in the actual performance of a judge is substantially greater than its interest in a judge's request for guidance, often necessitated by circumstances existing in the judge's personal life. More than likely many requests would involve fairly bland or innocuous situations. But it is also highly likely that on occasion a judge would be concerned about a very personal situation that might raise questions as to his or her impartiality or the appearance of impropriety. It could involve misconduct of a family member or substance abuse or mental illness of someone close to the judge.

Why should a good-faith inquiry for guidance in such a situation be made public?

The majority concedes that former Justice Almeida, as well as every other justice who sought an opinion from the committee, did so with a reasonable expectation of confidentiality. Nevertheless, they choose to ignore the privacy rights of inquiring judges and sacrifice the future benefits of consultation with this committee. This opinion is an illogical and a counterproductive response to the media-driven hysteria for public accountability. I am in full support of public accountability for all members of the judiciary in their professional duties. I deplore a decision that might lead to disclosure of information about a judge's personal affairs to which the public has no meaningful interest or about innocent third parties or family members whose privacy unquestionably should be respected.

I would comment at this point on material referred to in Justice Lederberg's concurring opinion. As far as can be determined, the partial release of one or two sentence abstracts of some of the advisory opinions was done by a staff person apparently without authorization from the committee or this court. That practice ended several years ago. This limited release of redacted information can hardly justify the drastic action sanctioned by the court today.

In a recent seminar involving representatives of the media and the judges of all our courts, the media was described by some of its members as a dollar-driven industry. Almost daily the media try and convict people of all manner of wrongdoing, long before these people have had their day in court, where some are ultimately exonerated. The majority's pious reference to the Canons of Ethics for Journalists gives little assurance in these times where tabloid journalism is becoming the rule rather than the exception. In the seminal decision on public access to judicial records, the United States Supreme Court recognized the courts' power to prevent their files from serving as "reservoirs of libelous statements for press consumption." *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570, 580 (1978). That very language may

have been the reason the drafters of the Access to Public Records Act (APRA) included in its first subsection entitled "Purpose," the statement: "[i]t is also the intent of this chapter to protect from disclosure information about particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy." G.L.1956 (1990 Reenactment) § 38–2–1.

Apart from my disagreement with the majority's decision to permit media access to committee opinions, I am most distressed about the additional decision to release supporting documents underlying the advisory opinions. Despite the obvious distinction between the actual advisory opinions and such supporting documents as the judge's request for advice or committee internal memoranda, the majority offers absolutely no further reasoning or balancing to justify the latter's release. In two cases involving the common-law right of access to judicial records, the United States Supreme Court has placed such trial-court documents as tape recordings, depositions and interrogatories beyond public reach. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 2207, 81 L.Ed.2d 17, 27 (1984) (pretrial depositions and interrogatories not public components of a civil trial); *Nixon,* 435 U.S. at 608, 98 S.Ct. at 1317, 55 L.Ed.2d at 586 (common-law right of access does not authorize release of tape recordings introduced at criminal trial). If the public may be denied access to these components of an actual trial, there cannot be a public right of access to supporting documents for advisory opinions issued by a five-member committee after informal deliberations. Even this court's rules that permit publication of Ethics Advisory Panel opinions issued to attorneys maintain confidentiality of the panel's proceedings and the attorney's identification. Sup.Ct.Rules, Ethics Advisory Panel R. 6. The public has no interest in the balance justifying the release of the documents and data supporting the committee opinions.

One final point that I would address is a threshold issue. Are these opinions of the committee judicial records within the common-law right of access? The court must first determine whether the records sought are judicial records prior to applying the common-law right of access. The court offers no rationale to support why advisory opinions should be treated as judicial records rather than as administrative materials.

Judicial records are those produced out of a judicial proceeding. Black's Law Dictionary, 849 (6th ed. 1990). A judicial proceeding is defined as one in which judicial action is involved or used to "obtain such remedy as the law allows." *Id.; see also Roberts v. City of Cranston Zoning Board of Review,* 448 A.2d 779, 781 (R.I.1982). A request for guidance from an advisory committee is not a judicial proceeding.

The Providence Journal Company (the Journal) argued that the committee performs administrative, not judicial, functions. That being the case, the Journal's access to administrative materials could not be based on the common-law right of access to judicial records. Even under APRA, the Journal might not be able to gain access to committee opinions. *See* G.L.1956 (1990 Reenactment) §§ 38–2–2(d)(1) and –2(d)(18)–(20) (providing exceptions to required disclosure that may encompass advisory opinions); *see also Providence Journal Co. v. Kane,* 577 A.2d 661, 665 (R.I.1990) (holding state employee personnel records exempt from disclosures under APRA); *Hydron Laboratories, Inc. v. Department of Attorney General,* 492 A.2d 135, 139 (R.I.1985) (holding court documents in pending litigation exempt from APRA). The requests for an advisory opinion and the opinion itself are not judicial records; therefore, they are not subject to the common-law right of access. They are, in my opinion, administrative records more akin to personnel records and should not be available under APRA.